# TIFFANY & BOSCO
P.A.

**Twenty Fourth Floor Central Arts Plaza**
**1850 North Central Avenue**
**PHOENIX, ARIZONA 85004**
**TELEPHONE: (602) 255-6000**
**FACSIMILE: (602) 255-0192**
Mark S. Bosco
State Bar No. 010167
Leonard J. McDonald
State Bar No. 014228
ljm@tblaw.com
Attorneys for Movant

26-09619-CE-AZ

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: | Chapter 11 |
| Elizabeth Ann Naylor and Ronald Stephen Owens Debtors. | Case No. 2:26-bk-05144-MCW |
| Alliant Credit Union | OBJECTION TO DEBTOR'S EMERGENCY MOTION TO EXTEND AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(c)(3)(B) |
| Secured Creditor, vs. | |
| Elizabeth Ann Naylor and Ronald Stephen Owens, Debtors, ZCHAPTER 11 FMC. | RE: Real Property Located at 11440 N 69th St Scottsdale, AZ 85254 |
| Respondents. | |

Alliant Credit Union, a secured creditor, by its attorneys, TIFFANY & BOSCO, P.A., hereby objects

to the Debtors Emergency Motion To Extend Automatic Stay Pursuant to 11 U.S.C. § 362(c)(3)(B).

This Objection is supported by the attached Memorandum of Points and Authorities, which is

incorporated herein by this reference.

Dated this 16th day of June, 2026.

Respectfully submitted,

TIFFANY & BOSCO, P.A.

BY  /s/ Leonard J. McDonald #014228
          Mark S. Bosco
          Leonard J. McDonald
          Attorneys for Movant

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Elizabeth Ann Naylor and Ronald Stephen Owens filed a voluntary petition for protection under Chapter 11 of the Bankruptcy Code. (No trustee has been appointed and debtors continue to act as debtors in possession.)

Debtors have an interest in certain real property located in Maricopa County, AZ, more particularly described as:

Lot 27, of DESERT ESTATE UNIT FIFTEEN, according to the plat of record in the office of County Recorder of Maricopa County, Arizona, recorded in Book 99 of Maps, Page 23.

Alliant Credit Union is the holder of a Home Equity Line of Credit Agreement and Truth in Lending Disclosure of which is secured by a Home Equity Line of Credit Deed of Trust (Securing Future Advances), dated May 3, 2024, recorded in the office of the Maricopa County Recorder's Office. True copies of the Note, Deed of Trust are annexed as Exhibits "A", and "B", respectively, and made a part hereof by this reference.

The debtors filed this instant bankruptcy on May 22, 2026 after a previous bankruptcy was filed and subsequently dismissed on January 26, 2026. (*see case 2:25-bk-07596-PS*) Pursuant to 11 U.S.C. § 362(c)(3)(A):

*if a single or joint case is filed by or against a debtor who is an individual in a case under chapter 7, 11, or 13, and if a single or joint case of the debtor was pending within the preceding 1-year period but was dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b) the stay under subsection (a) with respect to any action taken with respect to a debt or property securing such debt or with respect to any lease shall terminate with respect to the debtor on the 30th day after the filing of the later case*

The stay in this case is set to lift to all creditors on June 21, 2026. Debtors have filed a Motion to Extend the Stay pursuant to 11 U.S.C. § 362(c)(3)(B). However, this second bankruptcy filing is presumed to be in bad faith unless "rebutted by clear and convincing evidence to the contrary". The debtors attach no evidence to their motion. Moreover, Debtor's financial status indicates no change between the first and second bankruptcies. Debtor's monthly income was reported as $21,083.00 in the first bankruptcy which is the figure that the debtor relies upon through out their motion. The Chapter 13 Trustee, Edward J. Maney, recounted a significant shortage in the debtors' ability to complete the Chapter 13 plan in his recommendations.

Further, the debtors admit that this instant bankruptcy was filed to avoid the obligations of a Chapter 13. On page 14, paragraph 32 the debtors maintain:

*"Unlike the prior Chapter 13, Chapter 11 is not subject to the same plan-term constraints, trustee-controlled conduit payment structure, or confirmed-plan confirmation requirements that made the prior case vulnerable to administrative dismissal."*

The debtors suggest that a Chapter 13 was too burdensome and are now asking the court to believe that they would be more successful in completing a Chapter 11 without any significant change to their income.

Finally, the debtors are delinquent on their loan obligation to Alliant Credit Union. The loan is due and owing for July 2025. The debtors stopped making payments to Alliant one month prior to their first bankruptcy without explanation. After the Chapter 13 was dismissed, the debtors made no attempt to bring this loan current. Extending the stay will only further extend the delinquency.

**CONCLUSION**

The Debtors have not shown a significant change income to resolve the deficiencies of their previous bankruptcy and they have not demonstrated that this current bankruptcy was filed in good faith. Secured Creditor requests that the court deny debtors' Motion to Extend the Automatic Stay to allow Secured Creditor to foreclose the lien of its Deed of Trust or Mortgage; to evict debtors and/or successors of Debtors; and to obtain ownership, possession and control of the Property.

DATED this 16th day of June, 2026.

TIFFANY & BOSCO, P.A.

BY   /s/ Leonard J. McDonald #014228
    Mark S. Bosco
    Leonard J. McDonald
    1850 North Central Avenue, 24th Floor
    Phoenix, Arizona 85004
    Attorneys for Movant

# EXHIBIT "A"

**Georgia's Own Credit Union**
**100 Peachtree St**
**Atlanta, GA 30303**

# Home Equity Line of Credit Agreement and Truth in Lending Disclosure

| | |
|---|---|
| BORROWER 1 NAME Elizabeth Naylor | ACCOUNT NUMBER ███ |
| BORROWER 2 NAME Ronald Owens | |

PROPERTY ADDRESS 11440 N 69th St, Scottsdale, Arizona 85254

## CREDIT AGREEMENT AND TRUTH IN LENDING DISCLOSURE

**INTRODUCTION.** This disclosure contains important information about your Home Equity Line of Credit. You should read it carefully and keep a copy for your records. This Home Equity Line of Credit Agreement and Truth in Lending Disclosure will be referred to as the "Agreement.". This Agreement consists of (1) this Home Equity Line of Credit Agreement and Truth in Lending Disclosure, and (2) the accompanying Home Equity Addendum ("Addendum") which is incorporated into and becomes a part of this Agreement. The words "you," "your," and "Borrower" mean each person who signs this Agreement. The words "we," "us," "our," "Lender," and "Lender" mean the Lender whose name appears above or anyone to whom the Lender transfers its rights under this Agreement.

**1. HOW THIS LOAN WORKS.** This Agreement establishes a revolving line of credit Account ("Account"). You and the Lender anticipate that you will obtain a series of advances under this Agreement from time to time. The maximum amount you can borrow ("credit limit") is disclosed in the Addendum. It is the amount of credit you may borrow, repay all or a portion, and re-borrow subject to the terms of this Agreement.

**2. PROMISE TO PAY.** You promise to repay to the Lender, all advances made to you under this Account, plus finance charges, other applicable charges, and collection costs for which you are responsible under this Agreement. You agree to pay the minimum payment on or before the due date.

**3. JOINT ACCOUNTS.** If this is a joint Account, each of you must sign this Agreement and you will be individually and jointly responsible for the promises you make in this Agreement, including paying all amounts owed. This means that the Lender can require any one of you to repay all advances plus applicable finance charges. Unless the Lender's written policy requires all of you to sign for an advance, each of you authorizes the other(s) to obtain advances individually and agrees to repay advances made to the other(s). The Lender can release one of you from responsibility under this Agreement without releasing the other(s).

**4. SECURITY INTEREST.** This Account is secured by a mortgage, deed of trust, security deed, or security agreement (the "security instrument") in your property which is described in the Addendum.

**5. PROMISES IN SECURITY INSTRUMENT.** The security instrument you sign the same day you sign this Agreement is incorporated by reference into this Agreement. You must keep all the promises you made in the security instrument.

**6. APPLICATION OF PAYMENTS.** Payments will be applied in the order the Lender chooses to any

(Continued on next page)

## SIGNATURES

By signing or otherwise authenticating below, you agree that you have read the Addendum and this Agreement and agree to be bound by the terms and conditions contained herein. You also acknowledge receipt of a copy of this Agreement, and the Home Equity Early Disclosure and handbook entitled "What You Should Know About Home Equity Lines of Credit" given to you at the time of application.

*Notice to Vermont Borrowers:* **NOTICE TO COSIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.**

**NOTICE TO NEW JERSEY BORROWERS: Read this promissory note or loan agreement before you sign. Do not sign this promissory note or loan agreement if it contains blank spaces. The promissory note or loan agreement is secured by a secondary mortgage on your real property.**

| Borrower 1 Signature | | | |
|---|---|---|---|
| X *(signature)* | 5-6-24 | (seal) Date | |
| Elizabeth Naylor | | | |

| Borrower 2 Signature | | | |
|---|---|---|---|
| X *(signature)* | 5-6-24 | (seal) Date | |
| Ronald Owens | | | |

**⌂ LOANLINER**
HOME EQUITY SYSTEM

1

© CUNA Mutual Group 1998, 99, 2000, 01, 03, 06, 2012 All Rights Reserved

symhehtb

**CREDIT AGREEMENT AND TRUTH IN LENDING DISCLOSURE (Continued)**

finance charges and other applicable charges due before being applied to your unpaid balance.

7. **CREDIT LIMIT.** You promise not to request or obtain an advance that will make your balance exceed your credit limit. Your credit limit will not be increased if you exceed your credit limit. If you exceed your credit limit, you agree to repay the excess immediately.

8. **ACCESS DEVICES.** You can obtain credit advances in any manner authorized by the Lender from time to time. Specifically, you may obtain credit advances by using Home Equity Line of Credit Checks provided to you for this Account. Your application for this Account also serves as a request to receive any additional access devices which may be available in the future in connection with this Account. The terms of this Agreement will also apply to any future access devices we issue to you for accessing this Account.

9. **COST OF CREDIT.** The finance charge is the cost you pay for credit. Unless described otherwise on the Addendum, the finance charge on each new advance begins on the date of the advance and continues until the advance has been paid in full. There is no "free ride period" which would allow you to avoid a finance charge. We figure the finance charge on your account by applying the periodic rate to the "daily balance" of your Account for each day in the billing cycle. To get the "daily balance" we take the beginning balance of your Account each day, add any new purchases or advances and subtract any payments or credits. This gives us the daily balance. The daily balance is multiplied by the applicable periodic rate and that is the finance charge owed for that day. The sum of the daily finance charge for the period identified on your periodic statement is the amount due for that period. The periodic rate and corresponding annual percentage rate are disclosed in the Addendum. Your periodic statement will also reflect your current rate.

10. **ANNUAL PERCENTAGE RATE.** The annual percentage rate for this Account includes only interest and no other costs. The Addendum shows the current interest rate as a periodic rate and a corresponding annual percentage rate. The interest rate for this Account is a variable interest rate. The Addendum explains how the variable interest rate works. If we forego an annual percentage rate increase, we may return to the full index and margin at a later adjustment subject to any rate limitations.

11. **OTHER CHARGES.** In addition to finance charges, your Account is subject to certain other charges as described in this Agreement and the Addendum. The Lender can add any of these other charges to your balance or you can pay them in cash. You may also incur other charges for the servicing of your Account. Servicing charges will be provided to you by the Servicer of your Account prior to the service being rendered. For a list of Servicing Fees, contact the Loan Servicer identified on your periodic statement.

12. **CHARGES TO YOUR ACCOUNT.** We may charge your Account to pay other fees and costs that you are obligated to pay under this Agreement or under the security instrument. In addition, we may charge your Account for funds required for continuing property insurance coverage or costs to protect or perfect our security interest in your property. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your property. If you do not pay your property taxes, we may charge your Account and pay the delinquent taxes. Any amount so charged to your Account will be a credit advance. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

13. **LENDER'S RIGHTS:**

(a) **Termination and Acceleration.** In accordance with applicable law, we can terminate your credit line and require you to pay us the entire outstanding balance in one payment, charge you certain fees, suspend additional extensions of credit, or reduce your credit limit, if any of the following happen:

*For Wisconsin Borrowers Only:*

(1) You fail to make a required payment when due two (2) times within a twelve (12) month period, or

(2) Your failure to observe the terms of this Agreement materially impairs the condition, value or protection of, or our rights in, the property securing this Agreement.

*For Iowa Borrowers Only:*

If this transaction is subject to the Iowa Uniform Consumer Credit Code, you will be in default if:

(1) You fail to make a payment within ten days of the time required by agreement; or

(2) You fail to observe any other covenant of the transaction, breach of which materially impairs the condition, value or protection of or the Lender's right in any collateral securing the transaction, or materially impairs your prospect to pay amounts due under the transaction.

*For All Other Borrowers:*

(1) You engage in fraud or make a material misrepresentation at any time in connection with this Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition, or

(2) You do not meet the repayment terms of this Agreement, or

(3) Your action or inaction adversely affects the collateral for this Agreement or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the property, failure to pay taxes, death of all persons liable on the Account, transfer of title or sale of the property, creation of a senior lien on the property without our permission, foreclosure by a prior lienholder, use of the property for prohibited purposes, or taking of the property through eminent domain.

(b) **Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your credit limit during any period in which any of the following are in effect:

(1) The value of the property securing this Agreement declines significantly below the property's appraised value for purposes of this Agreement. This includes, for example, a decline such that the initial difference between the credit limit and the available equity is reduced by fifty (50) percent and may include a smaller decline depending on the individual circumstances.

(3) We reasonably believe that you will be unable to fulfill your payment obligations under this Agreement due to a material change in your

financial circumstances. You are in default of a material obligation of this Agreement. We consider all of your obligations to be material. Before exercising any of our rights under this Agreement, we will mail or deliver a notice of default to you.

(4) We are precluded by government action from imposing the annual percentage rate provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than 120 percent of the credit limit.

(6) We have been notified by a regulatory authority that continued advances may constitute an unsafe and unsound business practice.

(7) The maximum annual percentage rate under this Agreement has been reached.

(8) *For Wisconsin Borrowers Only:* You engage in fraud or material misrepresentation in connection with the Agreement.

**(b) Change in Terms.**

(1) *For Borrowers Outside of Texas:* We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of this Agreement, or if the change is insignificant (such as changes relating to our data processing systems). We may also change the terms of this Agreement in accordance with other reasons, if stated on the Addendum. If this Agreement follows an index and the index is no longer available, we will choose a new index and margin. The new index will have a historical movement substantially similar to the original index, and the new index and margin will result in an annual percentage rate that is substantially similar to the rate in effect at the time the original index becomes unavailable.

(2) *For Borrowers in Texas:* We may make changes to the terms of this Agreement if you agree to the change in writing at that time. If this Agreement follows an index and the index is no longer available, we will choose a new index and margin. The new index will have a historical movement substantially similar to the original index, and the new index and margin will result in an annual percentage rate that is substantially similar to the rate in effect at the time the original index becomes unavailable.

14. **USE OF ACCOUNT.** You promise to use your Account only for consumer (personal, family or household) purposes.

15. **MEMBERSHIP IN CREDIT UNION.** If the Lender is a credit union, you must be a member of the credit union to obtain this Account and any credit advances.

16. **CONFLICTING INSTRUCTIONS.** You agree not to provide conflicting instructions to us regarding your Account (such as instructing us not to make credit advances to a joint borrower).

17. **PREPAYMENT AND CURTAILMENT.** You may prepay all or part of what you owe at any time without any prepayment penalty. If you make a curtailment payment, your payment will be applied towards the balance of the Account. However, there will be a holding period of ten (10) calendar days before you may draw upon the credit line in the amount equal to

the curtailed amount.

18. **CANCELLATION BY YOU.** You can cancel your right to future credit advances under this Agreement, by notifying us in writing. If this is a joint Account and one of you cancels future credit advances under this Agreement, the cancellation will apply to both of you, unless the Lender gives written notice to one of you that you may continue to obtain advances. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due.

19. **TAX CONSEQUENCES.** You should consult a tax advisor regarding the deductibility of interest and charges under this Account.

20. **STATEMENT AND NOTICES.** You will be provided a periodic statement showing all transactions on your Account during the period covered by the statement. You must provide the Lender and any Loan Servicer current contact information, including but not limited to, address, phone number, and email address. Notice to any one of you will be notice to all.

21. **TRANSFER OR ASSIGNMENT.** You cannot assign your rights and obligations under this Agreement. In spite of any divorce or agreement between joint borrowers, each is responsible for the total amount owed under this Agreement. Subject to applicable law, we reserve the right to sell or transfer this Agreement to another lender, entity or person, and to assign our rights under the security instrument.

22. **UPDATING INFORMATION.** You promise that you will give us updated financial information and information about matters affecting the title and value of the property securing this Account. You agree that we may obtain credit reports and appraisals at our option. You may be responsible for the cost of the appraisal.

23. **PROPERTY INSURANCE.** You promise to insure the property that secures this Account, in the amount the Lender requires, against fire and other hazards (including flood insurance as required). You may obtain property insurance from anyone you want that is acceptable to the Lender and that is authorized to do business in the state or is an eligible surplus lines insurer. You must name us or our designee as the person to be paid under the policy in the event of a loss. If we request it, you must deliver to us a copy of the policy and proof that the premiums have been paid. We have the right not to accept the insurer for reasonable cause. Subject to applicable law, if you fail to obtain or maintain insurance as required, we may purchase insurance to protect our own interest, add the premium to your balance and/or pursue any other remedies available to us.

24. **NO WAIVER.** The Lender can delay enforcing any of its rights under this Agreement without losing any of its rights.

25. **CONTINUED EFFECTIVENESS.** If the law makes any term(s) of this Agreement unenforceable, the other terms will remain in effect.

26. **DUE ON SALE.** You promise to notify the Lender immediately if you enter into an agreement to sell or transfer ownership of all or any part of the property securing this Account. If you sell or transfer ownership without first obtaining the written consent of the Lender, the Lender may exercise its rights described in the security instrument, including the right to demand immediate payment in full of all sums secured by the security instrument.

27. **THE FOLLOWING NOTICE IS REQUIRED BY CALIFORNIA LAW: TRANSFER OF THE PROPERTY.** Subject to applicable law, Lender shall

**CREDIT AGREEMENT AND TRUTH IN LENDING DISCLOSURE (Continued)**

have the right to accelerate, that is, to demand immediate payment in full of all sums secured by this Mortgage or Deed of Trust, if Borrower, without the written consent of Lender, sells or transfers all or part of the property or any rights in the property.

28. **NOTICE TO GEORGIA BORROWERS.**

    (b) This is an instrument under seal.

    (c) **O,C,G,A. § 7-1-1014(3) requires that we inform you that if you fail to meet any condition or term of the documents that you sign in connection with obtaining a mortgage loan you may lose the property that serves as collateral for the mortgage loan through foreclosure.**

29. **NOTICE TO UTAH BORROWERS.** This written agreement is a final expression of the agreement between you and the Lender. This written agreement may not be contradicted by evidence of any oral agreement

30. **THE FOLLOWING NOTICE IS REQUIRED BY NEW YORK LAW: Default in the payment of this loan agreement may result in the loss of the property securing the loan. Under federal law, you may have the right to cancel this agreement. If you have this right, the creditor is required to provide you with a separate written note specifying the circumstances and times under which you can exercise this right.**

31. **NOTICE TO WASHINGTON BORROWERS. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

## BILLING RIGHTS – KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**NOTIFY US IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR STATEMENT.** If you think your statement is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address listed on your statement. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

- Your name and Account number.

- The dollar amount of the suspected error.

- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay a credit card Account automatically from your share Account or share draft Account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three business days before the automatic payment is scheduled to occur.

**YOUR RIGHTS AND OUR RESPONSIBILITIES AFTER WE RECEIVE YOUR WRITTEN NOTICE.** We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the statement was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to send statements to you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. you do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your statement that are not in question.

If we find that we made a mistake on your statement, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your statement. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your statement was correct.

Georgia's Own Credit Union NMLS: ▮▮▮▮▮▮
ION MORTGAGE AND LENDING LLC NMLS: ▮▮▮▮▮▮

Albert Paul Harvey NMLS: ▮▮▮▮▮

5

## BILLING RIGHTS – KEEP THIS NOTICE FOR FUTURE USE

**Georgia's Own Credit Union**
**100 Peachtree St**
**Atlanta, GA 30303**

# Home Equity Line of Credit Agreement and Truth in Lending Disclosure

BORROWER 1 NAME Sarah Owens

BORROWER 2 NAME Christian George Alfonso Navarro

ACCOUNT NUMBER ███████

PROPERTY ADDRESS 11440 N 69th St, Scottsdale, Arizona 85254

## CREDIT AGREEMENT AND TRUTH IN LENDING DISCLOSURE

**INTRODUCTION.** This disclosure contains important information about your Home Equity Line of Credit. You should read it carefully and keep a copy for your records. This Home Equity Line of Credit Agreement and Truth in Lending Disclosure will be referred to as the "Agreement.". This Agreement consists of (1) this Home Equity Line of Credit Agreement and Truth in Lending Disclosure, and (2) the accompanying Home Equity Addendum ("Addendum") which is incorporated into and becomes a part of this Agreement. The words "you," "your," and "Borrower" mean each person who signs this Agreement. The words "we," "us," "our," "Lender," and "Lender" mean the Lender whose name appears above or anyone to whom the Lender transfers its rights under this Agreement.

1. **HOW THIS LOAN WORKS.** This Agreement establishes a revolving line of credit Account ("Account"). You and the Lender anticipate that you will obtain a series of advances under this Agreement from time to time. The maximum amount you can borrow ("credit limit") is disclosed in the Addendum. It is the amount of credit you may borrow, repay all or a portion, and re-borrow subject to the terms of this Agreement.

2. **PROMISE TO PAY.** You promise to repay to the Lender, all advances made to you under this Account, plus finance charges, other applicable charges, and collection costs for which you are responsible under this Agreement. You agree to pay the minimum payment on or before the due date.

3. **JOINT ACCOUNTS.** If this is a joint Account, each of you must sign this Agreement and you will be individually and jointly responsible for the promises you make in this Agreement, including paying all amounts owed. This means that the Lender can require any one of you to repay all advances plus applicable finance charges. Unless the Lender's written policy requires all of you to sign for an advance, each of you authorizes the other(s) to obtain advances individually and agrees to repay advances made to the other(s). The Lender can release one of you from responsibility under this Agreement without releasing the other(s).

4. **SECURITY INTEREST.** This Account is secured by a mortgage, deed of trust, security deed, or security agreement (the "security instrument") in your property which is described in the Addendum.

5. **PROMISES IN SECURITY INSTRUMENT.** The security instrument you sign the same day you sign this Agreement is incorporated by reference into this Agreement. You must keep all the promises you made in the security instrument.

6. **APPLICATION OF PAYMENTS.** Payments will be applied in the order the Lender chooses to any

(Continued on next page)

## SIGNATURES

By signing or otherwise authenticating below, you agree that you have read the Addendum and this Agreement and agree to be bound by the terms and conditions contained herein. You also acknowledge receipt of a copy of this Agreement, and the Home Equity Early Disclosure and handbook entitled "What You Should Know About Home Equity Lines of Credit" given to you at the time of application.

*Notice to Vermont Borrowers:* **NOTICE TO COSIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.**

**NOTICE TO NEW JERSEY BORROWERS: Read this promissory note or loan agreement before you sign. Do not sign this promissory note or loan agreement if it contains blank spaces. The promissory note or loan agreement is secured by a secondary mortgage on your real property.**

| Borrower 1 Signature | | (seal) | Borrower 2 Signature | | (seal) |
|---|---|---|---|---|---|
| X _Sarah Owens_ | Date 5/3/24 | | X _Christian George Alfonso Navarro_ 5/3/24 | Date | |

**LOANLINER**
HOME EQUITY SYSTEM

© CUNA Mutual Group 1998, 99, 2000, 01, 03, 06, 2012 All Rights Reserved

1

symhehtb

finance charges and other applicable charges due before being applied to your unpaid balance.

**7. CREDIT LIMIT.** You promise not to request or obtain an advance that will make your balance exceed your credit limit. Your credit limit will not be increased if you exceed your credit limit. If you exceed your credit limit, you agree to repay the excess immediately.

**8. ACCESS DEVICES.** You can obtain credit advances in any manner authorized by the Lender from time to time. Specifically, you may obtain credit advances by using Home Equity Line of Credit Checks provided to you for this Account. Your application for this Account also serves as a request to receive any additional access devices which may be available in the future in connection with this Account. The terms of this Agreement will also apply to any future access devices we issue to you for accessing this Account.

**9. COST OF CREDIT.** The finance charge is the cost you pay for credit. Unless described otherwise on the Addendum, the finance charge on each new advance begins on the date of the advance and continues until the advance has been paid in full. There is no "free ride period" which would allow you to avoid a finance charge. We figure the finance charge on your account by applying the periodic rate to the "daily balance" of your Account for each day in the billing cycle. To get the "daily balance" we take the beginning balance of your Account each day, add any new purchases or advances and subtract any payments or credits. This gives us the daily balance. The daily balance is multiplied by the applicable periodic rate and that is the finance charge owed for that day. The sum of the daily finance charge for the period identified on your periodic statement is the amount due for that period. The periodic rate and corresponding annual percentage rate are disclosed in the Addendum. Your periodic statement will also reflect your current rate.

**10. ANNUAL PERCENTAGE RATE.** The annual percentage rate for this Account includes only interest and no other costs. The Addendum shows the current interest rate as a periodic rate and a corresponding annual percentage rate. The interest rate for this Account is a variable interest rate. The Addendum explains how the variable interest rate works. If we forego an annual percentage rate increase, we may return to the full index and margin at a later adjustment subject to any rate limitations.

**11. OTHER CHARGES.** In addition to finance charges, your Account is subject to certain other charges as described in this Agreement and the Addendum. The Lender can add any of these other charges to your balance or you can pay them in cash. You may also incur other charges for the servicing of your Account. Servicing charges will be provided to you by the Servicer of your Account prior to the service being rendered. For a list of Servicing Fees, contact the Loan Servicer identified on your periodic statement.

**12. CHARGES TO YOUR ACCOUNT.** We may charge your Account to pay other fees and costs that you are obligated to pay under this Agreement or under the security instrument. In addition, we may charge your Account for funds required for continuing property insurance coverage or costs to protect or perfect our security interest in your property. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your property. If you do not pay your property taxes, we may charge your Account and pay the delinquent taxes. Any amount so charged to your Account will be a credit advance. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**13. LENDER'S RIGHTS:**

**(a) Termination and Acceleration.** In accordance with applicable law, we can terminate your credit line and require you to pay us the entire outstanding balance in one payment, charge you certain fees, suspend additional extensions of credit, or reduce your credit limit, if any of the following happen:

*For Wisconsin Borrowers Only:*

(1) You fail to make a required payment when due two (2) times within a twelve (12) month period, or

(2) Your failure to observe the terms of this Agreement materially impairs the condition, value or protection of, or our rights in, the property securing this Agreement.

*For Iowa Borrowers Only:*

If this transaction is subject to the Iowa Uniform Consumer Credit Code, you will be in default if:

(1) You fail to make a payment within ten days of the time required by agreement; or

(2) You fail to observe any other covenant of the transaction, breach of which materially impairs the condition, value or protection of or the Lender's right in any collateral securing the transaction, or materially impairs your prospect to pay amounts due under the transaction.

*For All Other Borrowers:*

(1) You engage in fraud or make a material misrepresentation at any time in connection with this Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition, or

(2) You do not meet the repayment terms of this Agreement, or

(3) Your action or inaction adversely affects the collateral for this Agreement or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the property, failure to pay taxes, death of all persons liable on the Account, transfer of title or sale of the property, creation of a senior lien on the property without our permission, foreclosure by a prior lienholder, use of the property for prohibited purposes, or taking of the property through eminent domain.

**(b) Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your credit limit during any period in which any of the following are in effect:

(1) The value of the property securing this Agreement declines significantly below the property's appraised value for purposes of this Agreement. This includes, for example, a decline such that the initial difference between the credit limit and the available equity is reduced by fifty (50) percent and may include a smaller decline depending on the individual circumstances.

(3) We reasonably believe that you will be unable to fulfill your payment obligations under this Agreement due to a material change in your

financial circumstances. You are in default of a material obligation of this Agreement. We consider all of your obligations to be material. Before exercising any of our rights under this Agreement, we will mail or deliver a notice of default to you.

(4) We are precluded by government action from imposing the annual percentage rate provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than 120 percent of the credit limit.

(6) We have been notified by a regulatory authority that continued advances may constitute an unsafe and unsound business practice.

(7) The maximum annual percentage rate under this Agreement has been reached.

(8) *For Wisconsin Borrowers Only:* You engage in fraud or material misrepresentation in connection with the Agreement.

**(c) Change in Terms.**

(1) *For Borrowers Outside of Texas:* We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of this Agreement, or if the change is insignificant (such as changes relating to our data processing systems). We may also change the terms of this Agreement in accordance with other reasons, if stated on the Addendum. If this Agreement follows an index and the index is no longer available, we will choose a new index and margin. The new index will have a historical movement substantially similar to the original index, and the new index and margin will result in an annual percentage rate that is substantially similar to the rate in effect at the time the original index becomes unavailable.

(2) *For Borrowers in Texas:* We may make changes to the terms of this Agreement if you agree to the change in writing at that time. If this Agreement follows an index and the index is no longer available, we will choose a new index and margin. The new index will have a historical movement substantially similar to the original index, and the new index and margin will result in an annual percentage rate that is substantially similar to the rate in effect at the time the original index becomes unavailable.

**14. USE OF ACCOUNT.** You promise to use your Account only for consumer (personal, family or household) purposes.

**15. MEMBERSHIP IN CREDIT UNION.** If the Lender is a credit union, you must be a member of the credit union to obtain this Account and any credit advances.

**16. CONFLICTING INSTRUCTIONS.** You agree not to provide conflicting instructions to us regarding your Account (such as instructing us not to make credit advances to a joint borrower).

**17. PREPAYMENT AND CURTAILMENT.** You may prepay all or part of what you owe at any time without any prepayment penalty. If you make a curtailment payment, your payment will be applied towards the balance of the Account. However, there will be a holding period of ten (10) calendar days before you may draw upon the credit line in the amount equal to the curtailed amount.

**18. CANCELLATION BY YOU.** You can cancel your right to future credit advances under this Agreement, by notifying us in writing. If this is a joint Account and one of you cancels future credit advances under this Agreement, the cancellation will apply to both of you, unless the Lender gives written notice to one of you that you may continue to obtain advances. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due.

**19. TAX CONSEQUENCES.** You should consult a tax advisor regarding the deductibility of interest and charges under this Account.

**20. STATEMENT AND NOTICES.** You will be provided a periodic statement showing all transactions on your Account during the period covered by the statement. You must provide the Lender and any Loan Servicer current contact information, including but not limited to, address, phone number, and email address. Notice to any one of you will be notice to all.

**21. TRANSFER OR ASSIGNMENT.** You cannot assign your rights and obligations under this Agreement. In spite of any divorce or agreement between joint borrowers, each is responsible for the total amount owed under this Agreement. Subject to applicable law, we reserve the right to sell or transfer this Agreement to another lender, entity or person, and to assign our rights under the security instrument.

**22. UPDATING INFORMATION.** You promise that you will give us updated financial information and information about matters affecting the title and value of the property securing this Account. You agree that we may obtain credit reports and appraisals at our option. You may be responsible for the cost of the appraisal.

**23. PROPERTY INSURANCE.** You promise to insure the property that secures this Account, in the amount the Lender requires, against fire and other hazards (including flood insurance as required). You may obtain property insurance from anyone you want that is acceptable to the Lender and that is authorized to do business in the state or is an eligible surplus lines insurer. You must name us or our designee as the person to be paid under the policy in the event of a loss. If we request it, you must deliver to us a copy of the policy and proof that the premiums have been paid. We have the right not to accept the insurer for reasonable cause. Subject to applicable law, if you fail to obtain or maintain insurance as required, we may purchase insurance to protect our own interest, add the premium to your balance and/or pursue any other remedies available to us.

**24. NO WAIVER.** The Lender can delay enforcing any of its rights under this Agreement without losing any of its rights.

**25. CONTINUED EFFECTIVENESS.** If the law makes any term(s) of this Agreement unenforceable, the other terms will remain in effect.

**26. DUE ON SALE.** You promise to notify the Lender immediately if you enter into an agreement to sell or transfer ownership of all or any part of the property securing this Account. If you sell or transfer ownership without first obtaining the written consent of the Lender, the Lender may exercise its rights described in the security instrument, including the right to demand immediate payment in full of all sums secured by the security instrument.

**27. THE FOLLOWING NOTICE IS REQUIRED BY CALIFORNIA LAW: TRANSFER OF THE PROPERTY.** Subject to applicable law, Lender shall

have the right to accelerate, that is, to demand immediate payment in full of all sums secured by this Mortgage or Deed of Trust, if Borrower, without the written consent of Lender, sells or transfers all or part of the property or any rights in the property.

28. **NOTICE TO GEORGIA BORROWERS.**

    **(b)** This is an instrument under seal.

    **(c) O,C,G,A. § 7-1-1014(3) requires that we inform you that if you fail to meet any condition or term of the documents that you sign in connection with obtaining a mortgage loan you may lose the property that serves as collateral for the mortgage loan through foreclosure.**

29. **NOTICE TO UTAH BORROWERS.** This written agreement is a final expression of the agreement between you and the Lender. This written agreement may not be contradicted by evidence of any oral agreement

30. **THE FOLLOWING NOTICE IS REQUIRED BY NEW YORK LAW: Default in the payment of this loan agreement may result in the loss of the property securing the loan. Under federal law, you may have the right to cancel this agreement. If you have this right, the creditor is required to provide you with a separate written note specifying the circumstances and times under which you can exercise this right.**

31. **NOTICE TO WASHINGTON BORROWERS. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

## BILLING RIGHTS – KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**NOTIFY US IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR STATEMENT.** If you think your statement is wrong, or if you need more information about a transaction on your statement, write us on a separate sheet at the address listed on your statement. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

- Your name and Account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay a credit card Account automatically from your share Account or share draft Account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three business days before the automatic payment is scheduled to occur.

**YOUR RIGHTS AND OUR RESPONSIBILITIES AFTER WE RECEIVE YOUR WRITTEN NOTICE.** We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the statement was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to send statements to you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. you do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your statement that are not in question.

If we find that we made a mistake on your statement, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your statement. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your statement was correct.

Georgia's Own Credit Union NMLS: ████
ION MORTGAGE AND LENDING LLC NMLS: ████

Albert Paul Harvey NMLS: ████

Georgia's Own Credit Union
100 Peachtree St
Atlanta, GA 30303

HOME EQUITY ADDENDUM

| This Addendum is incorporated into and becomes a part of your Home Equity Line of Credit Agreement and Truth in Lending Disclosure |
|---|

| OPENING DATE | CREDIT LIMIT | ACCOUNT NUMBER |
|---|---|---|
| May 3, 2024 | $199,800.00 | ▮▮▮▮▮ |

| BORROWER NAME AND ADDRESS | ADDRESS OF PROPERTY SECURING ACCOUNT |
|---|---|
| Elizabeth Naylor<br>Ronald Owens<br>Sarah Owens<br>Christian George Alfonso Navarro<br>11440 N 69th Street<br>Scottsdale, AZ 85254 | 11440 N 69th St<br>Scottsdale, AZ 85254 |

| INDEX RATE | MARGIN ADDED TO INDEX | ANNUAL PERCENTAGE RATE | DAILY PERIODIC RATE | MINIMUM ANNUAL PERCENTAGE RATE |
|---|---|---|---|---|
| 8.500% | 1.250 % | 9.750 % | 0.027 % | 7.750% |

| SCHEDULE OF CLOSING COSTS: | | FINANCE CHARGES: | |
|---|---|---|---|
| DESCRIPTION | AMOUNT | DESCRIPTION | AMOUNT |
| Lender's Title Insurance | $ 650.00 | Lender Origination Fee | $ 450.00 |
| | | Escrow Fee | $ 380.00 |
| | | Recording Fee | $ 30.00 |
| | | Notary Fee (in state) | $ 125.00 |
| | | Notary Fee (out of state) | $ 150.00 |

PAYMENT INFORMATION: You can obtain credit advances for five (5) years. This period is called the "draw period." At our option, we may renew or extend the draw period. The Minimum Payment will be due monthly. Your minimum monthly payment during the draw period will be the greater of $50 or the amount by which your outstanding principal loan balance exceeds your credit limit (if any), plus the amount of accrued but unpaid finance charges, late charges, and any other charges authorized by your agreement with us. If the account balance is less than the minimum monthly payment, then your monthly payment will equal your account balance. Your minimum payments during the draw period may not reduce the principal balance that is outstanding on your account.

After the draw period ends the repayment period will begin. The length of the repayment period will be twenty five (25) years. The Minimum Payment for the repayment period will be due monthly on the date shown on your periodic statement. At the beginning of the repayment period, we will amortize your outstanding balance at the current annual percentage rate over 300 months. The Minimum Payment amount during the repayment period is the amount necessary to fully amortize the outstanding balance at the beginning of the repayment period (plus interest) over the repayment period. The Minimum Payment during the repayment period also includes the amount of accrued but unpaid finance charges, late charges, and any other charges authorized by your agreement with us. Your Minimum Payment amount and the date it is due will be reflected on your periodic statement. Each time the index increases or decreases, it will cause a change to the annual percentage rate. When the annual percentage rate increases or decreases, we will adjust your Minimum Payment by increasing it or decreasing it in order to repay the balance within the original twenty five (25) years.

The maturity date is the date on which your last payment is due. On the maturity date, you must pay the amount of any outstanding balance remaining on your account. The Minimum Payments may not be sufficient to repay the principal that is outstanding on your account. If they are not, you will be required to pay the entire outstanding balance in a single balloon payment. Unless otherwise required by applicable law, we are under no obligation to refinance the balloon payment at that time. You may be required to make payments out of other assets you own or find a lender, which may be us, willing to lend you the money. If you refinance the balloon with us, you may have to pay some or all of the closing costs.

GOVERNING LAW (Whichever box is checked will apply)
☑ Federal law and the law of the jurisdiction in which the property is located shall govern this Agreement
☐ Federal law and Maryland law and specifically subtitle 9 of Title 12 of the Commercial Article of the Maryland Code apply to this Agreement.

PERIODIC RATE AND CORRESPONDING ANNUAL PERCENTAGE RATE: This HELOC has a variable rate feature. We will determine the periodic rate and the corresponding annual percentage rate as follows. We start with an independent index, (the "Index"), which is the Wall Street Journal Prime Rate. To determine the periodic rate that will apply to your account, we add a margin, as disclosed above, to the value of the Index. Then we divide this sum by the number of days in a year (365). To obtain the annual percentage

©TruStage Compliance Solutions, 1992, 1999, 2011, 2023

Georgia's Own Credit Union NMLS: ▮▮▮▮▮
ION MORTGAGE AND LENDING LLC NMLS: ▮▮▮▮▮
Albert Paul Harvey N▮▮▮ ▮
Page 1 of 4
Powered by Docu Prep Inc. 2024 ⑤
11/2023

Case 2:▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮0   Desc
Main Document    Page 16 of 34

rate we will multiply the periodic rate by the number of days in a year (365). This result is the annual percentage rate.

If the index changes, the annual percentage rate will change. A change in the annual percentage rate will become effective the day following the day the index changes. There is no limit on the amount by which the annual percentage rate can change during any one (1) year period. The maximum **ANNUAL PERCENTAGE RATE** that can apply is 18% or the maximum permitted by law, whichever is less. However, under no circumstances will your **ANNUAL PERCENTAGE RATE** go below the minimum **ANNUAL PERCENTAGE RATE** as disclosed above.

TRANSACTION REQUIREMENTS: The minimum Credit Limit that we offer is $50,000.00. If you don't qualify for the minimum Credit Limit, your loan application will be denied. The required minimum initial draw is $50,000.00, unless otherwise required by state law. Subsequent draws have no limit unless otherwise required by state law.

OTHER CHARGES:
  Annual Fee: $150.00 annual fee to maintain a line of credit. This fee will be paid to the Servicer following loan closing and annually thereafter during the Draw Period.
  Late Charges: If you make your minimum payment after the due date, you may be assessed a late fee as permitted by state law. The late fee will be assessed as follows: If your payment is more than 10 days late, you will be charged 5% of the minimum payment due.
  Non-Sufficient Funds Fee: You agree to pay a returned check charge of $25.00, or up to the maximum permitted by law, for each check or other instrument tendered as payment under this Agreement and Addendum that is returned or dishonored.

COLLECTION COSTS:

For Borrowers in CO: You promise to pay, subject to any limits under applicable law, all costs of collecting the amount you owe under this agreement. This includes but is not limited to reasonable attorney's fees not to exceed 15% of the unpaid debt after termination or acceleration of your account and referral to an attorney not our salaried employee, as well as legal expenses for any bankruptcy, appeals or postjudgment proceedings. If not prohibited by applicable law you will also pay any court costs.

For Borrowers in DE: You promise to pay, subject to any limits under applicable law, all costs of collecting the amount you owe under this agreement. This includes but is not limited to legal expenses for any bankruptcy, appeals or postjudgment proceedings. If not prohibited by applicable law you will also pay any court costs.

For Borrowers in GA: You promise to pay, subject to any limits under applicable law, all costs of collecting the amount you owe under this agreement. If collected by or through an

attorney, you promise to pay attorney's fees not to exceed 15% of the principal and interest owing as well as legal expenses for any bankruptcy, appeals or postjudgment proceedings. If not prohibited by applicable law you will also pay any court costs.

For Borrowers in IA: You promise to pay subject to any limits under the Iowa Uniform Consumer Credit Code, all costs of collecting the amount you owe under this agreement. This includes but is not limited to reasonable attorney's fees and court costs as well as legal expenses for any bankruptcy, appeals or postjudgment proceedings.

For Borrowers in ID: You promise to pay, subject to any limits under the Idaho Credit Code, all costs of collecting the amount you owe under this agreement. This includes but is not limited to reasonable attorney's fees paid or to be paid to an attorney who is not our salaried employee, as well as legal expenses for any bankruptcy, appeals or postjudgment proceedings. If not prohibited by applicable law, you will also pay any court costs.

For Borrowers in IL: You promise to pay, subject to applicable law, all costs of collecting what you owe under this agreement or realizing on security including court costs, collection agency fees and reasonable attorney's fees. We may enter into a contingent or hourly fee arrangement with an attorney or collection agency and you agree that such an agreement is reasonable. This provision also applies to bankruptcy, appeals or postjudgment proceedings.

For Borrowers in KS: You promise to pay, subject to any limits under applicable law, all costs of collecting the amount you owe under this agreement. This includes but is not limited to reasonable attorney's fees and court costs as well as legal expenses for any bankruptcy, appeals or postjudgment proceedings incurred by an individual who is not a salaried employee of the Lender.

For Borrowers in MI: You promise to pay, subject to any limits under applicable law, all costs of collecting the amount you owe under this agreement. This includes but is not limited to reasonable attorney's fees as fixed by the court as well as legal expenses for any bankruptcy, appeals or postjudgment proceedings. If not prohibited by applicable law you will also pay any court costs.

For Borrowers in NE: You promise to pay, except to the extent that our obtaining your agreement to do so is prohibited by applicable law and our enforcing such an agreement may be limited by applicable law, all costs of collecting the amount you owe under this agreement. This includes but is not limited to reasonable attorney's fees and court costs as well as legal expenses for any bankruptcy, appeals or postjudgment proceedings.

For Borrowers in NH: You promise to pay, subject to any limits

©TruStage Compliance Solutions, 1992, 1999, 2011, 2023

Georgia's Own Credit Union NMLS: ███
ION MORTGAGE AND LENDING LLC NMLS: ███
Albert Paul Harvey NM█ ███

Page 2 of 4

Powered by Docu Prep Inc. 2024 ░

11/2023

under applicable law, all costs of collecting the amount you owe under this agreement. This includes but is not limited to reasonable attorney's fees and court costs as well as legal expenses for any bankruptcy, appeals or postjudgment proceedings. If, by applicable law, we are permitted to collect attorney's fees from you as part of our costs of collecting under this agreement, then you, to the extent required by New Hampshire Revised Statutes Annotated Chapter 361-C as amended, shall be entitled to reasonable attorney's fees if you prevail in (a) any action, suit or proceeding brought by us, or (b) any action brought by you. If you successfully assert a partial defense or setoff, recoupment or counterclaim to any action brought by us, the court may withhold from us the entire amount or such portion of the attorney's fees as the court considers equitable.

For Borrowers in OK: You promise to pay, subject to any limits under applicable law, all costs of collecting the amount you owe under this agreement. This includes but is not limited to reasonable attorney's fees not to exceed 15% of the unpaid debt after termination or acceleration of your account and referral to an attorney not our salaried employee, as well as legal expenses for any bankruptcy, appeals or postjudgment proceedings. If not prohibited by applicable law you will also pay any court costs.

For Borrowers in SC: You promise to pay, subject to any limits under the South Carolina Consumer Protection Code, all costs of collecting the amount you owe under this agreement. This includes but is not limited to reasonable attorney's fees not to exceed 15% of the unpaid debt upon referral to any attorney who is not our salaried employee, as well as legal expenses for any bankruptcy, appeals or postjudgment proceedings. If not prohibited by applicable law you will also pay any court costs.

For Borrowers in TX: To the extent permitted by law, you promise to pay all reasonable costs and expenses we incur in collecting the amount you owe under this Plan. This includes but is not limited to reasonable attorney's fees.

For Borrowers in WI: Unless this agreement is subject to the Wisconsin Consumer Act you promise to pay all costs of collecting the amount you owe under this agreement. This includes but is not limited to reasonable attorney's fees and court costs as well as legal expenses for any bankruptcy, appeals or postjudgment proceedings.

For Borrowers in WV: No collection costs.

For Borrowers in AK, AL, AR, AZ, CA, CT, DC, FL, HI, IN, KY, LA, MA, MD, ME, MN, MO, MS, MT, NC, ND, NJ, NM, NV, NY, OH, OR, PA, RI, SD, TN, UT, VA, VT, WA, WY: You promise to pay, subject to any limits under applicable law, all costs of collecting the amount you owe under this agreement. This includes but is not limited to reasonable attorney's fees and court costs as well as legal expenses for any bankruptcy,

appeals or postjudgment proceedings.

The following notice is required by California law: No Lender shall require a borrower, as a condition of receiving or maintaining a loan secured by real property, to provide hazard insurance coverage against risks to the improvements on that real property in an amount exceeding the replacement value of the improvements on the property.

ADDITIONAL PROVISIONS FOR TEXAS BORROWERS: You and the Lender will sign a written acknowledgement as to the fair market value of the Property described in the Deed of Trust, on the date this Plan is established.

You shall be liable for the indebtedness under this Plan only to the extent of the Property described in the Deed of Trust that secures the payment of this Plan. If you default in the payment of such indebtedness or in your performance under this Plan or the Deed of Trust, any judicial proceedings brought by us against you shall be limited to enforcement and foreclosure of the lien created by the Deed of Trust. If there is foreclosure of such lien, no judgment for any deficiency shall be sought or obtained by us against you. Notwithstanding the foregoing limitation of liability, you shall be fully and personally liable if you or your spouse committed actual fraud in obtaining or in connection with this Plan or any instrument governing, securing or pertaining to the payment hereof.

Except as may be otherwise provided in this Plan or the Deed of Trust securing this Plan, and subject to applicable law, you waive your rights to require us to do certain things. Those things are (A) to give notice of intent to accelerate the maturity date of the outstanding principal balance under this Plan (known as "notice of intent to accelerate"); (B) to demand payment of amounts due (known as "presentment"); (C) to give notice that amounts due have not been paid (known as "notice of dishonor"); (D) to obtain an official certification of nonpayment (known as a "protest").

You and your spouse may within three days after closing rescind this Plan without penalty or charge.
Notwithstanding what is provided in Section 13(c) of this Plan, we may not unilaterally change the terms of this Plan.

HOME EQUITY LINE OF CREDIT ACCESS: We may authorize you to obtain credit advances by writing Home Equity Line of Credit checks that we provide to you for your Account. We reserve the right to reject, decline and return any unpaid check at our discretion, including but not limited to the following circumstances:

(a) Your Credit Limit has been or would be exceeded by paying the check.
(b) Your check is post-dated. If a post-dated check is paid and as a result any other check is returned or not paid, we are not responsible.
(c) Your checks have been reported lost or stolen. You should notify us at once if your checks are lost or stolen.
(d) Your check is not signed by an "Authorized Signer", which means a person who signed this Agreement, or has

©TruStage Compliance Solutions, 1992, 1999, 2011, 2023

Georgia's Own Credit Union NMLS: ███
ION MORTGAGE AND LENDING LLC NMLS: ███
Albert Paul Harvey NM███

Page 3 of 4

Powered by Docu Prep Inc. 2024 ▨

11/2023

signed a separate signature card for the Account.

(e) Your Account has been terminated or suspended as provided in this Agreement.

(f) The amount of your check is less than the minimum amount required by this Agreement or you are in violation of any other transaction requirement.

If we pay any check under these conditions, you must repay us for the amount of the check and any charges permitted by law. If your check is returned unpaid, we will charge you a fee for that returned check. The check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in the Agreement is not wrongful dishonor. We may not return the check along with your periodic statements; however, your use of a check will be reflected on your periodic statement as a draw advance. We do not "certify" checks drawn on your account. If you ask us to stop payment on a check, you may be charged a stop payment fee. Home Equity Line of Credit Checks may include an expiration date printed on the check. We will honor checks received for payment before the expiration date printed on the check, provided your Account is open and in good standing, with available credit.

By signing or otherwise authenticating below, you agree that you have read the Addendum and agree to be bound by the terms and conditions contained herein.

| Elizabeth Naylor | 5-6-24 Date | Ronald Owens | 5-6-24 Date |
| Sarah Owens | 5/3/24 Date | Christian George Alfonso Navarro | 5/3/24 Date |

©TruStage Compliance Solutions, 1992, 1999, 2011, 2023

Georgia's Own Credit Union NMLS: ███
ION MORTGAGE AND LENDING LLC NMLS: ███
Albert Paul Harvey N███

Page 4 of 4

Powered by Docu Prep Inc. 2024

Case ███ Desc 11/2023

## ALLONGE

**Loan Number:** ███████████

**Borrower(s):** Ronald Owens and Elizabeth Naylor, husband and wife and Christian George Alfonso Navarro and Sara Owens, husband and wife, as joint tenants with right of survivorship

**Property Address:** 11440 N 69th St

Scottsdale, Arizona 85254

**Credit Limit:** $199,800.00

**Loan Date: May 3, 2024**

### PAY TO THE ORDER OF WITHOUT RECOURSE

**Alliant Credit Union**

**Georgia's Own Credit Union**

By: _____

**Printed Name:** Shenita Murray

**Title:** Vice President

# EXHIBIT "B"

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
STEPHEN RICHER
20240248785    05/10/2024    10:56
ELECTRONIC RECORDING

**Pioneer Title Agency, Inc.**

After Recording Return To:
**Rebecca Waldrup/Symmetry Lending**
**6600 Peachtree Dunwoody Rd.**
**Building 400, Suite 290**
**Atlanta, Georgia 30328**
Attn: **SHIPPING DEPT./DOC. CONTROL**

———— [Space Above This Line For Recording Data] ————

# HOME EQUITY LINE OF CREDIT DEED OF TRUST
(Securing Future Advances)

Borrower has established a line of credit ("Home Equity Line of Credit") with Lender as evidenced by Borrower's Home Equity Line of Credit Agreement and Truth in Lending Disclosure and the Home Equity Addendum (collectively the "Note") dated the same date as this Security Instrument, and all renewals, extensions, modifications, replacements and substitutions thereof (collectively, the "Agreement"). Lender has agreed to make advances to Borrower under the terms of the Agreement. Such advances shall be of a revolving nature and may be made, repaid and remade from time to time. Borrower and Lender contemplate a series of advances to be secured by this Security Instrument. The total outstanding principal balance owing at any one time under the Agreement (not including charges and collection costs which may be owing from time to time, and any advances made by Lender to protect its security) shall not exceed (U.S. $199,800.00 ) plus interest thereon (the "Credit Limit"). That sum is referred to in the Agreement as the Credit Limit. The entire indebtedness under the Agreement, if not paid earlier, is due and payable on **May 5, 2054** or on such later date as may be permitted by Lender in writing, or at such earlier date in the event such indebtedness is accelerated in accordance with the terms of the Agreement and/or this Security Instrument.

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 10, 12, 17, 19 and 20. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "**Security Instrument**" means this document, which is dated **May 3, 2024**, together with all Riders to this document.

**(B)** "**Borrower**" is Ronald Owens and Elizabeth Naylor, husband and wife and Christian George Alfonso Navarro and Sara Owens, husband and wife, as joint tenants with right of survivorship, whose address is **11440 N 69th Street, Scottsdale, Arizona 85254**. Borrower is the trustor under this Security Instrument.

**(C)** "**Lender**" is Georgia's Own Credit Union . Lender is a Credit Union organized and existing under the laws of Georgia. Lender's address is **100 Peachtree St , Atlanta, Georgia 30303**. Lender is the beneficiary under this Security Instrument.

**(D)** "**Trustee**" is Fidelity National Title Insurance Company, a Nebraska corporation . Trustee's address is 60 E. Rio Salado Parkway, Tempe, Arizona 85281.

**(E)** "**Agreement**" means the Equity Line of Credit Agreement and Truth in Lending Disclosure and the Home Equity Addendum (collectively the "Note") signed by Borrower and dated **May 3, 2024**. The Agreement states that Lender has agreed to make advances to Borrower under the terms of the Agreement, such advances to be of a revolving nature. The total outstanding principal balance owing at one time under the Agreement (not including charges and collection costs which may be owing from time to time under the Agreement) shall not exceed the Credit Limit of **One Hundred Ninety Nine Thousand Eight Hundred And 00/100 Dollars (U.S. $199,800.00)** plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **May 5, 2054**.

**ARIZONA Home Equity Security Instrument**

Page 1 of 10

Pioneer Title Agency, Inc.

After Recording Return To:
**Rebecca Waldrup/Symmetry Lending**
**6600 Peachtree Dunwoody Rd.**
**Building 400, Suite 290**
**Atlanta, Georgia 30328**
Attn: **SHIPPING DEPT./DOC. CONTROL**

Recorded Electronically
ID 202402248785
County Maricopa
Date/Time 5/10/24 10:56 AM

──────── [Space Above This Line For Recording Data] ────────

# HOME EQUITY LINE OF CREDIT DEED OF TRUST
(Securing Future Advances)

Borrower has established a line of credit ("Home Equity Line of Credit") with Lender as evidenced by Borrower's Home Equity Line of Credit Agreement and Truth in Lending Disclosure and the Home Equity Addendum (collectively the "Note") dated the same date as this Security Instrument, and all renewals, extensions, modifications, replacements and substitutions thereof (collectively, the "Agreement"). Lender has agreed to make advances to Borrower under the terms of the Agreement. Such advances shall be of a revolving nature and may be made, repaid and remade from time to time. Borrower and Lender contemplate a series of advances to be secured by this Security Instrument. The total outstanding principal balance owing at any one time under the Agreement (not including charges and collection costs which may be owing from time to time, and any advances made by Lender to protect its security) shall not exceed (U.S. **$199,800.00** ) plus interest thereon (the "Credit Limit"). That sum is referred to in the Agreement as the Credit Limit. The entire indebtedness under the Agreement, if not paid earlier, is due and payable on **May 5, 2054** or on such later date as may be permitted by Lender in writing, or at such earlier date in the event such indebtedness is accelerated in accordance with the terms of the Agreement and/or this Security Instrument.

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 10, 12, 17, 19 and 20. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** **"Security Instrument"** means this document, which is dated **May 3, 2024**, together with all Riders to this document.
**(B)** **"Borrower"** is **Ronald Owens and Elizabeth Naylor, husband and wife and Christian George Alfonso Navarro and Sara Owens, husband and wife, as joint tenants with right of survivorship**, whose address is **11440 N 69th Street, Scottsdale, Arizona 85254**. Borrower is the trustor under this Security Instrument.
**(C)** **"Lender"** is **Georgia's Own Credit Union** . Lender is a Credit Union organized and existing under the laws of **Georgia**. Lender's address is **100 Peachtree St , Atlanta, Georgia 30303**. Lender is the beneficiary under this Security Instrument.
**(D)** **"Trustee"** is **Fidelity National Title Insurance Company, a Nebraska corporation** . Trustee's address is 60 E. Rio Salado Parkway, Tempe, Arizona 85281.
**(E)** **"Agreement"** means the Equity Line of Credit Agreement and Truth in Lending Disclosure and the Home Equity Addendum (collectively the "Note") signed by Borrower and dated **May 3, 2024**. The Agreement states that Lender has agreed to make advances to Borrower under the terms of the Agreement, such advances to be of a revolving nature. The total outstanding principal balance owing at one time under the Agreement (not including charges and collection costs which may be owing from time to time under the Agreement) shall not exceed the Credit Limit of **One Hundred Ninety Nine Thousand Eight Hundred And 00/100** Dollars (U.S. **$199,800.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **May 5, 2054**.

ARIZONA Home Equity Security Instrument

Page 1 of 10

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Account"** means the debt evidenced by the Agreement, plus interest, any prepayment charges and late charges due under the Agreement, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[ ] Adjustable Rate Rider    [ ] Condominium Rider    [ ] 1-4 Family Rider
[ ] Balloon Rider    [ ] Planned Unit Development Rider    [ ] Other(s) [specify]
 [ ] Biweekly Payment Rider
 [ ] Second Home Rider

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Agreement, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Agreement and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (a) the prompt repayment of the Account evidenced by the Agreement, and all renewals, extensions and modifications of the Agreement, with the interest thereon at the rate provided in the Agreement; (b) the payment of all other sums due under the Agreement, with interest thereon at the rate provided in the Agreement, (i) advanced to protect the security of this Security Instrument, (ii) incurred by Lender in connection with the enforcement of its rights under this Security Instrument and/or the Agreement, and/or (iii) required to be paid as set forth herein or in the Agreement; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and any prior mortgage or deed of trust. However, this Security Instrument does not secure any hazardous substances indemnity or guaranty.

For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County [Type of Recording Jurisdiction] of **MARICOPA** [Name of Recording Jurisdiction]:

Case 2:26-bk-05144-MCW   Doc 46   Filed 06/16/26   Entered 06/16/26 11:55:20   Desc
Main Document    Page 24 of 34

**SEE ATTACHED EXHIBIT "A"**

Property Tax ID Number: ███████
which currently has the address of **11440 N 69th St [Street] Scottsdale [City], Arizona [State] 85254 [Zip Code]** ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the Property, and all easements, appurtenances, and fixtures now or hereafter a part of the Property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest and Other Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Agreement and if allowable under Applicable Law, any prepayment charges and late charges and other charges due under the Agreement. Payments due under the Agreement and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Agreement or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Agreement and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

**2. Application of Payments or Proceeds.** If your loan account balance on a payment date is less than the minimum payment amount, you promise to pay only the loan account balance. You can pay off all or part of what you owe at any time. However, so long as you owe any amount you must continue to make your periodic minimum payment. The amounts you pay will be applied first to finance charges, then to principal, then to escrow (if applicable), and finally to any other charges that you owe. Your first payment will be due on the first payment date after you receive your first statement. All other payments are due on the payment dates described above. Your monthly payment cannot be made using an access check from the line of credit.

We may, if required or permitted by law, or in the event you fail to pay taxes or maintain required insurance on the property, require that you establish and fund on a monthly basis an escrow account with us for payment of taxes and/or insurance.

**3. Funds for Escrow Items.**
[This section intentionally omitted]

**4. Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument. Borrower shall pay when due, all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.

Borrower shall promptly discharge any lien other than a lien disclosed to Lender in Borrower's application or in any title report Lender obtained which has priority over this Security Instrument unless Borrower: (a) agrees in writing to

**ARIZONA Home Equity Security Instrument**

the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Agreement. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.

Subject to Applicable Law, all insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Agreement and the Account up to the amount of the outstanding Account balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agree to generally assign rights to insurance proceeds to the holder of the agreement and the Account, up to the amount of the outstanding Account balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.

If Lender believes that Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 21 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Agreement or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Subject to the rights of any hold of a mortgage, deed of trust or other security agreement with a lien which has priority over this Security Instrument, Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Agreement, the Account or this Security Instrument, whether or not then due.

**6. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or

**ARIZONA Home Equity Security Instrument**

prior to such an interior inspection specifying such reasonable cause.

**7. Borrower's Home Equity Line of Credit Application.** Borrower shall be in default if, during the home equity line of credit application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**8. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which has or may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Lender believes that Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has or may attain priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 8, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 8.

Any amounts disbursed by Lender under this Section 8 shall become additional debt of Borrower secured by this Security Instrument if allowed under Applicable Law. These amounts shall bear interest at the Agreement rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**9. Mortgage Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Agreement) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.

**10. Assignment of Miscellaneous Proceeds; Forfeiture.** The Miscellaneous Proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Security Instrument.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

If Lender believes that the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's

**ARIZONA Home Equity Security Instrument**

judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Agreement (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Agreement without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Account Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, as allowed under Applicable Law., In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender shall have the authority to impose additional fees and charges to perform services requested by or on behalf of Borrower, or to otherwise administer and service the Agreement and the Account. The additional fees and charges may include administrative costs incurred by Lender and/or in reimbursement of payment made by Lender to third parties. Such fees and charges shall be secured by the Security Instrument up to the amount of the credit Limit and, unless Borrower and Lender agree to other terms of payment, be payable, with interest, immediately following rewritten demand from Lender to Borrower requesting payment thereof, Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If either the Agreement or the Account is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Agreement and the Account exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Agreement or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment with any prepayment charge (whether or not a prepayment charge is provided for under the Agreement). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower may have arising out of such overcharge.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding

**ARIZONA Home Equity Security Instrument**

requirement under this Security Instrument. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Agreement conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Agreement which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** Borrower shall be given one copy of the Agreement and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.**

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Agreement as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, as allowed under Applicable Law; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Agreement/Account; Change of Loan Servicer; Notice of Grievance.** The Agreement and Account, or a partial interest in the Agreement and the Account (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Agreement and this Security Instrument and performs other mortgage loan servicing obligations under the Agreement, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Agreement. If there is a change of the Loan Servicer, if required under Applicable Law, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Agreement and the Account is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Agreement and the Account, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Agreement and the Account Agreement purchaser unless otherwise provided by the purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until

**ARIZONA Home Equity Security Instrument**

such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 14) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this section. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 21 and the notice of acceleration given to Borrower pursuant to Section 17 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 19.

**20. Hazardous Substances.** As used in this Section 20: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of**

ARIZONA Home Equity Security Instrument

the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

**22. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**23. Substitute Trustee.** Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**24. Time of Essence.** Time is of the essence in each covenant of this Security Instrument.

REQUEST FOR NOTICE OF DEFAULT
AND FORECLOSURE UNDER SUPERIOR
MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Security Instrument to give Notice to Lender, at Lender's address set forth on page one of this Security Instrument, of any default under the superior encumbrance and of any sale or other foreclosure action.

**IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

**NOTICE TO CONSUMER**

1. Do not sign this paper before you read it.
2. You are entitled to a copy of this paper.
3. You may prepay the unpaid balance at any time without penalty and may be entitled to receive a refund of unearned charges in accordance with the law.

**ARIZONA Home Equity Security Instrument**

Case 2:26-bk-05144-MCW    Doc 46    Filed 06/16/26    Entered 06/16/26 11:55:20    Desc
Main Document    Page 31 of 34

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
Elizabeth Naylor                                    -Borrower

_____ (Seal)
Ronald Owens                                       -Borrower

_____ (Seal)
Sarah Owens                                        -Borrower

_____ (Seal)
Christian George Alfonso Navarro          -Borrower

New York          Queens

**STATE OF ~~ARIZONA~~, ~~MARICOPA~~ County ss:**

The foregoing instrument was acknowledged before me this May 3rd, 2024 by ~~Elizabeth Naylor and Ronald Owens~~ and Sarah Owens and Christian George Alfonso Navarro.

My Commission Expires: 09/27/2025

_____
Notary Public

Georgia's Own Credit Union NMLS: ███
ION MORTGAGE AND LENDING LLC NMLS: ███                    Albert Paul Harvey NMLS: ███

Tearah N. Chestnut
Notary Public - State of New York
NO. 01CH6422681
Qualified in Queens County
Commission Expires 09/27/2025

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3003   1/01 (rev. 6/02)
Page 10 of 10

# NOTARY ACKNOWLEDGEMENT

State of   Arizona            }
                             } ss.
County of  Maricopa          }

The foregoing instrument was acknowledged before me this ___6th___ day of May, 2024, by **Elizabeth Naylor and Ronald Owens**.



_____
NOTARY PUBLIC

My commission expires: 3·19·2026

**DENA L. PETTY**
**Notary Public - Arizona**
**Maricopa Co. / #623539**
**Expires 03/19/2026**

THIS NOTARY CERTIFICATE IS TO BE ATTACHED TO:  Home Equity Line of Credit Deed of Trust

Date of Document:  May 3, 2024 / Consisting of 10 pages
Parties to Document:
Ronald Owens and Elizabeth Naylor and Christian George Alfonso Navarro and Sarah Owens
Georgia's Own Credit Union
Fidelity National Title Insurance Company, a Nebraska corporation

Exhibit "A"

**Lot 27, of DESERT ESTATES UNIT FIFTEEN, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, recorded in Book 99 of Maps, Page 23.**