Elizabeth Ann Naylor and Ronald Stephen Owens
11440 N. 69th Street
Scottsdale, Arizona 85254
*Debtors-in-Possession, Pro Se*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA

In re:
ELIZABETH ANN NAYLOR and
RONALD STEPHEN OWENS,
                    Debtors

Case No. 2:26-bk-05144-MCW
Chapter 11
Honorable Madeleine C. Wanslee

**DEBTORS' REPLY TO UNITED STATES TRUSTEE'S OBJECTION AND ALLIANT CREDIT UNION'S OBJECTION TO EMERGENCY MOTION TO EXTEND AUTOMATIC STAY**

Debtors-in-Possession Elizabeth Ann Naylor and Ronald Stephen Owens, appearing pro se, hereby submit this Reply to the Objection of the United States Trustee (Doc. 37) and the Objection of Alliant Credit Union (Doc. 46) to Debtors' Emergency Motion to Extend Automatic Stay Pursuant to 11 U.S.C. § 362(c)(3)(B) (Doc. 32), and respectfully show the following:

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

The schedule discrepancies identified in the United States Trustee's objection share a common explanation: an emergency skeleton petition filed without counsel on the morning of May 22, 2026 — a Friday — after the attorney who had been working with Debtors to prepare the filing and was scheduled to file it that morning informed them he was unable to proceed. With Monday a court holiday and the foreclosure sale scheduled for the morning of Tuesday,

May 26, Debtors had no choice but to file the skeleton petition themselves that Friday or lose their home permanently. Debtors disclosed this circumstance to the Court in their Motion to Extend Schedules Deadline (the "Schedules Motion"), filed June 3, 2026 and currently pending before this Court — filed precisely because that last-minute withdrawal made a complete and accurate filing impossible and because Debtors needed time to retain new counsel to prepare amended schedules with the care and thoroughness the emergency filing could not achieve. The Schedules Motion expressly acknowledged that the schedules are incomplete and inaccurate as a result of those emergency circumstances and requested an extension to June 26, 2026 to file accurate, complete amended schedules. Subject to the Court's approval of that extension, complete, accurate, and verified amended schedules will be filed by June 26, 2026, correcting every discrepancy identified in the objection.

This filing was not made solely to address the pending foreclosure. As stated under penalty of perjury in the Joint Declaration filed with the Stay Motion, Debtors filed this Chapter 11 to reorganize their financial affairs and address obligations to all creditors — secured and unsecured — through a confirmed plan of reorganization, and to pursue a mortgage modification through the Court's Mortgage Modification Mediation Program. The Stay Motion itself requests extension of the automatic stay as to all creditors, not merely as to the foreclosing lienholder. The reorganization purpose is comprehensive, documented, and sworn.

Alliant Credit Union's objection was filed on June 16, 2026 at 11:55 a.m. The Court's June 11, 2026 Order required all objections to be filed no later than June 15, 2026 at 5:00 p.m. Alliant's objection was therefore filed approximately nineteen hours after the court-ordered deadline. Debtors respectfully submit that it should not be considered. To the extent the Court considers it, Debtors address its substance in Section VI of this reply.

Debtors also note for the Court's consideration that the creditors whose interests are most directly and immediately affected by the automatic stay have not opposed its extension. U.S. Bank Trust Company, National Association, as Trustee for COLT 2024-3 Mortgage Loan Trust — the holder of the first mortgage on Debtors' primary residence and the party whose foreclosure sale is scheduled for July 28, 2026 — is represented in this case by Robertson, Anschutz, Schneid, Crane & Partners, PLLC, which filed a Notice of Appearance on June 6, 2026. Neither the Trust nor its counsel of record has filed any objection to the stay extension. Select Portfolio Servicing, Inc., the servicer conducting the foreclosure proceedings on behalf of the Trust, has also filed no objection. The absence of any objection from the creditors most directly and immediately affected by the stay is a relevant consideration in evaluating the good faith of this filing.

Debtors' good faith is further demonstrated by the record of actions taken simultaneously with this filing. On June 3, 2026 — the same day they filed the Schedules Motion and the Stay Motion — Debtors served a formal seven-section Notice of Error, Request for Information, and Qualified Written Request on Select Portfolio Servicing, Inc. pursuant to 12 C.F.R. §§ 1024.35 and 1024.36, documenting six specific RESPA violations and demanding the partial payment deferral that is the precise resolution being sought in this reorganization. A companion letter was transmitted simultaneously to U.S. Bank Trust Company as Trustee at the noteholder contact address SPS itself provided. The Consumer Financial Protection Bureau complaint on file, Complaint No. 250429-20442264, was simultaneously supplemented. On June 11, 2026 — the same day the UST filed her objection — SPS responded to that formal demand with a letter stating: 'SPS is committed to home retention and offers many assistance options designed for customers who are experiencing temporary or permanent hardship. These options are offered at

no cost to our customers and may include special payment arrangements, structured repayment plans, or loan modifications.' SPS's own written response to the RESPA demand — received on the same date the UST's objection was filed — describes loan modification as an available option on this account as of that date.

The property at 11440 N. 69th Street, Scottsdale, Arizona 85254 has been specifically adapted to accommodate the medical needs of Debtor Ronald Stephen Owens. Mr. Owens is eighty years old, has lived with Parkinson's disease for twenty-five years, carries a current stage four cancer diagnosis, and has serious heart disease.  Elizabeth Ann Naylor, age sixty-nine, is Mr. Owens's wife and full-time caregiver. An adult daughter with autism and epilepsy also resides at the property. The automatic stay preserves Debtors' ability to pursue the reorganization process through which this home may be retained. Its termination would result in the foreclosure sale of a medically adapted residence currently occupied by a disabled elderly man who depends upon it for his daily care.

## II.  THE APPLICABLE LEGAL FRAMEWORK

Section 362(c)(3)(A) provides that where a debtor had a prior case pending within the preceding one-year period that was dismissed, the automatic stay terminates with respect to the debtor on the 30th day after the filing of the later case. 11 U.S.C. § 362(c)(3)(A). Section 362(c)(3)(B) permits the Court to extend the stay upon notice and a hearing completed before expiration of the 30-day period, upon a showing by clear and convincing evidence that the current case was filed in good faith as to the creditors to be stayed. 11 U.S.C. § 362(c)(3)(B). The burden of proof rests with the Debtors. In re Van Damme, 2025 WL 3188018, *5 (9th Cir. BAP Nov. 14, 2025).

Section 362(c)(3)(C) provides that a presumption of bad faith arises where there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the prior case. 11 U.S.C. § 362(c)(3)(C). That presumption is rebuttable by clear and convincing evidence. Id. In Van Damme — the most recent Ninth Circuit BAP authority on this question, decided November 14, 2025 — the court identified the applicable good faith factors as: (1) whether the debtor misrepresented facts in the petition or filed in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor only intended to defeat state court litigation; and (4) whether egregious behavior is present. Van Damme, 2025 WL 3188018 at *10 (citing In re Leavitt, 171 F.3d 1219, 1224 (9th Cir. 1999)). Each factor is addressed below.

In re Reswick, 446 B.R. 362 (9th Cir. BAP 2011), cited by the UST, stands for the proposition that a repeat filer whose purpose is solely to invoke the automatic stay to forestall legitimate creditor remedies does not demonstrate good faith. Reswick is distinguishable on its facts in every material respect. In Reswick, the debtor had no realistic prospect of reorganization and no income adequate to service the debt. Here, Debtors have documented monthly income of $21,083 consisting entirely of guaranteed, lifetime defined-benefit pension payments and Social Security benefits that cannot be reduced, garnished, or interrupted. Ronald Owens's AFTRA pension alone, at $12,686 per month, exceeds the $12,439.21 monthly mortgage payment. A plan providing for cure and reinstatement under 11 U.S.C. § 1124(2) — a right the first lienholder cannot block upon plan confirmation — is arithmetically feasible on these numbers without any modification whatsoever. This is not Reswick.

The UST argues in her conclusion that secured debt against the Property exceeds $1.9 million against a property value of just $1.5 million and that this renders the case administratively futile. This argument misapprehends the legal standard. Cure and reinstatement

under 11 U.S.C. § 1124(2) does not require that a property have equity. It requires only that the debtor have the income to service the monthly contractual payment and to cure arrears on a schedule the plan prescribes. Debtors' documented monthly income of $21,083 satisfies that standard. The relationship between the property value and the total outstanding debt is a consideration for plan confirmation and lien treatment, not a threshold barrier to the stay extension that Congress created to preserve the reorganization process.

Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, prohibits public entities — including federal courts — from excluding qualified individuals with disabilities from participating in or benefiting from their programs, services, or activities. Tennessee v. Lane, 541 U.S. 509, 533-34 (2004). This Court is required to make reasonable modifications to its rules and procedures to avoid such exclusion. 28 C.F.R. § 35.130(b)(7). For the reasons described above, Ronald Stephen Owens is a qualified individual with disabilities within the meaning of 42 U.S.C. § 12102. Preserving the reorganization process through which a qualified individual with disabilities may address the threatened loss of his medically adapted home is precisely the kind of reasonable modification Title II contemplates. Denying the stay extension forecloses that process entirely and permanently.

The § 362(c)(3)(C) presumption of bad faith is rebutted here by clear and convincing evidence of both changed legal circumstances and documented attorney failure. The relevant change is not limited to income — which has always been sufficient to fund a confirmable plan, as documented benefit letters confirm and as Alliant's own objection concedes — but extends to the legal framework now available to address the mortgage dispute. Chapter 11 provides three specific tools that were unavailable or structurally inaccessible in the prior Chapter 13.

First, Chapter 11 permits Debtors to propose a plan directly without the conduit payment structure through which the Chapter 13 Trustee administered mortgage payments — a structure that created administrative vulnerability when plan payments fell into arrears during the period prior bankruptcy counsel substituted a private negotiation track for the MMM motion Debtors had expressly requested in writing.

Second, Chapter 11 provides access to the Court's Mortgage Modification Mediation Program in a framework where SPS must participate in a documented, court-supervised evaluation — a mechanism prior bankruptcy counsel declined to invoke in writing on September 25, 2025, characterizing it as 'probably a waste of time and energy. And money,' and substituting instead an unstructured private negotiation that SPS was free to abandon without consequence.

Third, Chapter 11 provides the right to cure and reinstate the mortgage on its original contractual terms under 11 U.S.C. § 1124(2) upon plan confirmation — a statutory right that SPS cannot defeat regardless of its loss-mitigation position.

The change from Chapter 13 to Chapter 11 is not a repetition of a failed strategy. It is a direct and considered response to the specific structural failures of the prior case — failures attributable to prior bankruptcy counsel's documented decisions and inaction, not to the Debtors. Courts in the Ninth Circuit have recognized that where a prior dismissal results from attorney error or abandonment rather than debtor misconduct, the § 362(c)(3)(C) presumption is rebutted. The written record here squarely presents that circumstance.

## III. THE PENDING SCHEDULES MOTION EXPLAINS AND ADDRESSES EVERY DISCREPANCY THE UST IDENTIFIES

The threshold issue the UST raises — that Debtors' schedules contain material discrepancies from the Chapter 13 schedules — is not a good faith issue. It is a skeleton filing issue, and the emergency circumstances that produced that skeleton filing are specific. The attorney who had been working with Debtors to prepare this filing and was scheduled to file it that morning informed them on May 22, 2026 — a Friday, four days before a Tuesday foreclosure sale with Monday a court holiday — that he was unable to proceed. Debtors had no choice but to file the petition themselves that morning, without counsel, without the time to prepare complete and accurate schedules, and without the guidance that would have produced them. Debtors disclosed this circumstance to the Court in their Schedules Motion filed June 3, 2026 — eight days before the UST filed her objection — and every discrepancy identified results from those emergency circumstances, not from any intent to misrepresent.

Subject to the Court's approval of the pending Schedules Motion, complete, fully accurate, and verified amended schedules will be filed by June 26, 2026, correcting every discrepancy the UST has identified: the property ownership structure, accurately reflecting the joint tenancy with right of survivorship held by all four title holders; the unsecured debt, included in full consistent with the Chapter 13 disclosure; all business entity ownership interests and EINs, including Good Luck Shop LLC, a New Mexico entity formed in November 2024 that never became operational and has zero value; all business income disclosures on the statement of financial affairs accurately reflecting Quartet Farms income for all applicable periods; all household expenses including payments made on behalf of Laura Owens, disclosed on Schedule J and SOFA Item 8; and Elizabeth Ann Naylor's former name Jan Black. The amended schedules will be verified under penalty of perjury and will reflect the complete and accurate financial picture of this estate.

A discrepancy between the Chapter 13 schedules and an acknowledged emergency skeleton filing that Debtors disclosed to the Court before the objection was filed is not a misrepresentation. It is an expected consequence of filing under extreme time pressure without counsel — which is precisely why Fed. R. Bankr. P. 1007(c) authorizes extensions of time to file complete schedules and why Debtors filed the Schedules Motion eight days before the UST filed her objection. Denying the stay extension does not cure the schedule deficiencies. It forecloses the home before they can be corrected. Extending the stay allows the reorganization to proceed, the amended schedules to be filed on June 26 as committed, and the Court and all parties to evaluate this case on a complete and accurate record.

The UST argues that the income figures in the current and prior schedules reflect a financial position that has deteriorated rather than improved. Those figures do not accurately reflect Debtors' actual financial capacity. The skeleton Schedule J was filed on an emergency basis without counsel and incompletely disclosed income — it is an acknowledged skeleton filing, not a final statement of financial condition. The amended schedules will correctly reflect actual monthly income of approximately $21,083 per month. That figure — not the skeleton filing artifact of $406.85 — is the relevant measure of feasibility.

Debtors' actual documented monthly income consists of two lifetime AFTRA defined-benefit pension payments — $12,686 per month for Ronald Stephen Owens and $2,730 per month for Elizabeth Ann Naylor — and Social Security benefits for both Debtors, for a combined total monthly income of approximately $21,083 per month. All four income streams are fully verifiable by benefit letters on file with the respective plan administrators. Both AFTRA pensions were elected on a 100% joint-and-survivor basis, meaning neither pension terminates at either spouse's death — the surviving spouse continues to receive the full benefit. Social Security

survivorship rules provide additional protection: the surviving spouse receives the higher of the two Social Security benefits. The income stream supporting this mortgage is therefore protected through the lifetime of either spouse and continues at a level sufficient to service the contractual monthly payment through the maturity of the note in May 2054 regardless of which spouse survives. Alliant Credit Union's own untimely objection concedes the $21,083 figure — confirming that the actual income has never been in genuine dispute.

Since the filing of this case on May 22, 2026, Debtors have not resumed post-petition mortgage payments to Select Portfolio Servicing. On May 27, 2026 — five days after filing — SPS mailed a written communication to Debtors stating: "Our records indicate that your obligation has been discharged under the United States Bankruptcy Code." That statement was factually and legally incorrect — discharge in Chapter 11 occurs only after plan confirmation and completion of all plan payments, neither of which had occurred. The appropriate mechanism and timing for post-petition mortgage payments is a matter properly addressed within the reorganization framework under the Court's supervision. Debtors are actively retaining bankruptcy counsel to guide the proper administration of this case and are committed to servicing this obligation as part of this reorganization. The UST cannot credibly characterize the absence of post-petition payments as evidence of bad faith when SPS — the foreclosing servicer — represented to Debtors in writing that the obligation had already been discharged.

### IV.  THE REORGANIZATION PURPOSE IS GENUINE, CONCRETE, AND FEASIBLE

This Chapter 11 was filed to accomplish what the Chapter 13 could not accomplish because prior bankruptcy counsel declined to invoke the available mechanism. The

reorganization purpose is not theoretical. It is specific, documented, arithmetically supportable, and sworn under penalty of perjury.

First, Debtors intend to seek referral of the first mortgage to this Court's Mortgage Modification Mediation Program. The MMM Program creates a structured, court-supervised framework in which SPS would be required to participate in a documented evaluation of the modification options its own written correspondence repeatedly describes as available on this account. Prior bankruptcy counsel refused to file the MMM motion in writing on September 25, 2025, characterizing it as 'probably a waste of time and energy. And money.' That refusal denied Debtors the one mechanism available to compel SPS's structured participation and substituted an unstructured private negotiation track that SPS was free to abandon — which it did. This Chapter 11 restores access to that mechanism.

Second, Debtors intend to propose a plan of reorganization providing for cure and reinstatement of the first mortgage on its original contractual terms pursuant to 11 U.S.C. § 1124(2). Under § 1124(2), a plan that provides for the cure of any default and reinstatement of the maturity of a claim renders that claim unimpaired — and an unimpaired creditor cannot object to confirmation on the basis of the plan's treatment of its claim. This right is not contingent on SPS's agreement. It is a statutory right that cannot be defeated by the lienholder upon plan confirmation. Debtors' documented income is sufficient to fund a confirmable plan on these terms.

Third, the RESPA Notice of Error and QWR served June 3, 2026 has demanded that SPS identify the specific governing provision it has cited for over a year as the basis for its refusals. A companion letter to U.S. Bank Trust Company as noteholder makes the same demand directly of

the Trust. SPS has never produced that provision. Until it does, there is no documented basis for its refusal to evaluate the deferral it has described as available in its own written letters. The reorganization process is the appropriate forum to compel that answer.

This reorganization also serves purposes beyond the first mortgage dispute. As Debtors stated in their sworn Joint Declaration filed with the Stay Motion: 'We filed Case No. 2:25-bk-07596-PS on August 14, 2025 to reorganize our financial affairs, address our unsecured obligations through a plan, and pursue a mortgage modification through the Court's MMM Program.' The current Chapter 11 was filed for the same comprehensive purpose. The Stay Motion requests extension of the automatic stay as to all creditors — not merely as to the foreclosing lienholder — because this reorganization is designed to address all creditors of this estate through a confirmed plan, secured and unsecured alike. A filing that seeks to treat all creditors through a court-supervised plan is not a filing designed solely to obstruct a foreclosure. It is a filing designed to reorganize.

The stay motion requests extension for the duration of this Chapter 11 case because anything less would be insufficient to accomplish these objectives. MMM referral requires a motion, a mediator assignment, and a structured negotiation period. Plan confirmation under § 1124(2) requires a disclosure statement, a plan, and a confirmation hearing. Neither can be accomplished in a matter of weeks. A stay extension limited to an arbitrary short period would not preserve the reorganization process — it would merely postpone the same result. Section 362(c)(3)(B) was enacted to preserve reorganization for good-faith re-filers, not to provide a temporary delay. Where good faith is established by clear and convincing evidence — as it is here — the stay should be extended for the duration of the case so that the reorganization process Congress authorized can function as intended.

## V.  THE GOOD FAITH SHOWING IN THE STAY MOTION REMAINS UNREBUTTED

### A.  Misrepresentations in Pleadings.

For the reasons set forth in Section III above, the schedule discrepancies identified by the UST are not misrepresentations. They are disclosed, explained skeleton filing deficiencies that are the subject of the pending Schedules Motion filed eight days before the UST's objection. The UST has not identified a single affirmative misrepresentation — a statement Debtors made knowing it to be false. She has identified discrepancies between an emergency skeleton filing and a prior final filing in a case where Debtors themselves disclosed the skeleton filing's incompleteness to the Court before the objection was filed.

More broadly, the good faith of this filing is demonstrated by its scope. The Stay Motion requests extension as to all creditors — not merely as to the foreclosing lienholder. The Joint Declaration states under penalty of perjury that the reorganization purpose includes addressing unsecured obligations through a confirmed plan. A debtor filing solely to delay a foreclosure does not seek a stay as to all creditors, commit under oath to a plan that addresses all obligations, and simultaneously serve formal RESPA demands on the servicer and write directly to the noteholder.

### B.  History of Filings and Dismissals.

The Chapter 13 was not dismissed because Debtors abandoned their obligations or acted in bad faith. It was dismissed because prior bankruptcy counsel failed to act during a period in which Elizabeth Ann Naylor was in continuous written communication with his office from November 2025 through the date of dismissal — asking for help, asking for motions to be filed,

and asking specific questions about procedural mechanisms that could have prevented dismissal — while prior bankruptcy counsel took no action and, at the critical moments, did not respond at all.

On November 18, 2025 — the same day the Chapter 13 Trustee filed his Motion to Dismiss — Elizabeth Ann Naylor wrote to prior bankruptcy counsel's office requesting a motion to extend time to comply, citing family crisis circumstances. Counsel's office responded that a motion to extend time could not be filed because it was a conduit case. The Trustee's Motion to Dismiss itself told Debtors otherwise: it expressly provided that dismissal could be prevented by requesting a hearing within thirty days, filing a motion to resolve the outstanding issues, or filing a Notice of Conversion. Elizabeth Ann Naylor continued to follow up throughout November and December 2025, asking about available options.

On December 8, 2025, the Chapter 13 Trustee issued his Evaluation and Recommendation Report (Case No. 2:25-bk-07596-PS, Doc. 25), which expressly stated: "The Plan can be confirmed subject to the condition(s) noted above, adequate funding, and timely filed Stipulated Order Confirming, and Court approval." Confirmation was not denied. It was conditioned. The Trustee gave prior bankruptcy counsel thirty days — until January 7, 2026 — to address the identified conditions and submit a Stipulated Order Confirming. Prior bankruptcy counsel's office communicated as late as December 15-16, 2025 that it was actively preparing the order confirming and would need documents and signatures. Despite those assurances, prior bankruptcy counsel submitted nothing to the Trustee within the thirty-day window.

On January 6, 2026 — one day before the thirty-day window closed — Elizabeth Ann Naylor sent a detailed written communication directly to prior bankruptcy counsel raising every outstanding issue and asking specifically: whether requesting a hearing, as the Trustee's own Motion to Dismiss had identified as an available option, remained viable to prevent dismissal; and what steps could allow the case to continue while the remaining issues were resolved. This was not a vague request for general guidance. The Trustee's own filing had spelled out the path to preventing dismissal. Elizabeth Ann Naylor found it, asked her attorney about it directly, and requested that he act on it. Prior bankruptcy counsel never responded to that communication.

When the Trustee filed the Notice of Intent to Lodge Dismissal Order on January 13, 2026, Elizabeth Ann Naylor reached out again on January 20, 2026 — asking about the deadline and whether an appointment could be scheduled before it passed. Prior bankruptcy counsel's office scheduled a phone call but took no legal action. On January 22, 2026 — four days before dismissal — Elizabeth Ann Naylor sent a final written request to both prior bankruptcy counsel and his paralegal specifically asking that an objection and a motion to extend time be filed. Prior bankruptcy counsel did not respond. The case was dismissed on January 26, 2026. Elizabeth Ann Naylor wrote again the same day seeking guidance on next steps. After dismissal, prior bankruptcy counsel declined to refile and directed Debtors to search the internet for new attorneys.

The UST argues that Debtors made no effort to bring their concerns about their attorney to the Court's attention and made no attempt to seek reconsideration of the dismissal order. Debtors were pro se from the moment of dismissal — prior bankruptcy counsel declined to refile and directed them to find new attorneys on the internet. They were elderly, managing a household in medical crisis, and without any legal guidance or transition assistance. The absence

of a reconsideration motion under those circumstances is not evidence of bad faith. It is evidence of the very problem this Chapter 11 was filed to address.

The UST argues that certain conditions were within Debtors' exclusive control — specifically the tax returns and the plan payment delinquency. With respect to the tax returns: Debtors were actively compiling the required documentation and communicated that to prior bankruptcy counsel in writing on January 6 and January 22, 2026. The 2023 and 2024 federal and state income tax returns have since been prepared and filed. Copies are available upon request. With respect to the plan payment delinquency and the arrearage growth: those payments fell into arrears and the arrearage grew for specific documented reasons that are addressed in Section V.C below. With respect to the feasibility shortfall identified in the Trustee's Recommendation — that Schedules I and J revealed disposable income of only $14,443 against plan payments of $15,600 — that figure did not accurately reflect Debtors' actual monthly income of approximately $21,083. The Chapter 13 schedules were prepared under the same pressures and without the benefit of the careful preparation that the amended schedules in this case will reflect. The amended schedules will correctly state the actual income, and on those figures no feasibility shortfall would exist.

Debtors desperately wanted the Chapter 13 to succeed. They sought it, retained counsel, attempted to engage with their attorney continuously throughout the process, identified the procedural mechanisms that could have saved it, and asked their attorney to act on them. The dismissal was not the product of debtor bad faith or indifference. It was the product of counsel's failure to act during a period when action was available, documented, and specifically requested in writing. Where a prior dismissal results from attorney error or abandonment rather than debtor

misconduct, the § 362(c)(3)(C) presumption is rebutted by the same clear and convincing evidence of good faith that the record here presents.

**C. Filing to Defeat State Court Litigation — The Arrearage and the Futility Argument.**

The UST argues that the sole purpose of this filing was to halt the Trustee's Sale, that the arrearage grew nearly eightfold in little more than a year demonstrating a lack of financial wherewithal and discipline, and that two years of failed modification attempts make further pursuit futile. Each argument is addressed in turn.

The growth of the mortgage arrearage from approximately $24,000 in April 2025 to $191,420.90 at the petition date requires context the UST's objection does not provide. When Debtors filed the CFPB complaint on April 29, 2025, the arrearage was approximately $24,000 and Debtors were actively seeking the partial payment deferral that would have allowed them to resume regular payments while addressing the accumulated arrears. SPS responded on May 12, 2025 by certifying to the CFPB that the account was ineligible for loss-mitigation review and that no error had occurred — while enclosing, as attachments to that certification, the Deed of Trust whose own terms expressly authorize modification, forbearance, and deferral. SPS did not provide the specific denial reasons required by 12 C.F.R. § 1024.41(d). It did not identify the specific governing provision it claimed prohibited modification — a provision it has never produced in over fourteen months of documented contacts. By August 2025, when Debtors filed the Chapter 13, the cure amount documented by SPS's own Notice of Default was $49,925.74 — reflecting accrual during the period SPS was actively refusing to evaluate the deferral it described as available in its own written letters.

Debtors did not stop making mortgage payments out of indifference or inability to pay. They deferred payments during a period in which they were actively pursuing — through the CFPB complaint, through NACA, and ultimately through separate real estate counsel who made repeated documented contacts with SPS and its Ombudsman department in September 2025 within the re-submission window SPS itself had offered — a negotiated resolution that SPS kept describing as available in writing while refusing to provide through any direct channel. Prior bankruptcy counsel declined in writing on September 25, 2025 to file the MMM motion that would have placed SPS's conduct under court supervision, characterizing it as 'probably a waste of time and energy. And money.' Without that mechanism, Debtors had no forum in which SPS's conduct could be compelled. They deferred payments in anticipation of a resolution that the available forums were ultimately unable to produce because SPS refused to engage in good faith with any of them.

The arrearage of $191,420.90 is explained by the arithmetic of the timeline. SPS's own June 1, 2026 payoff statement reflects a daily accrual rate of $344.31. From the time regular mortgage payments were deferred in anticipation of a negotiated loss-mitigation resolution through the petition date of May 22, 2026 — a period of approximately nine months — that daily rate accounts for the bulk of the arrearage above the pre-Chapter 13 balance. The arrearage accumulated because every loss-mitigation channel available outside of court allowed SPS to decline without consequence — by telephone, through CFPB response, and through counsel contacts, SPS simply refused. The critical distinction this Chapter 11 creates is that the MMM Program is not a channel SPS can decline. Participation is court-supervised and mandatory. SPS must appear, must engage, and must document its position in a structured process before a

neutral mediator under the Court's authority. That is categorically different from every avenue Debtors have pursued over the past two years.

The UST argues that 'the Debtors have been unable to obtain a mortgage modification for at least two years,' that 'there are no facts to suggest that they'll be able to secure one now,' and that 'any additional attempt to compel the lender to modify the Property mortgage is simply an exercise in futility.' Debtors understand why the record as presented appears to support that conclusion. SPS did consistently communicate through direct channels — verbally by telephone, through its CFPB response, and through counsel contacts — that modification was unavailable on this account. Debtors do not dispute that those direct communications occurred.

What the futility argument does not account for is that SPS simultaneously and repeatedly communicated the opposite in writing. On at least six identified dates between June 2025 and May 2026, SPS mailed letters on its own letterhead describing modification, deferral, rate reduction, and maturity extension as currently available on this account — the same account SPS was simultaneously declaring ineligible through every direct channel. SPS has never identified the specific governing provision that resolves the contradiction between those two positions. The RESPA Notice of Error served June 3, 2026 demanded that SPS produce that provision. SPS has not produced it. If a specific governing provision prohibiting modification exists, SPS can produce it and the futility argument becomes documentable. If it does not exist — if SPS has been declining modification on a basis it cannot articulate — then the prior two years of refusal reflect not a legally supportable position but a servicer practice that has never been subjected to court supervision. The MMM Program subjects that practice to exactly the supervision it has evaded. That is not futility. That is the reorganization process working as Congress designed it.

Furthermore, the UST's statement that 'there are no facts to suggest' modification can be secured was contradicted by SPS itself on the very day it was filed. On June 11, 2026 — the date the UST filed her objection — SPS responded to Debtors' formal RESPA demand by stating: 'SPS is committed to home retention and offers many assistance options designed for customers who are experiencing temporary or permanent hardship. These options are offered at no cost to our customers and may include special payment arrangements, structured repayment plans, or loan modifications.' That response postdates the objection and constitutes SPS's own written acknowledgment, as of the date the objection was filed, that loan modifications are available options on this account. A servicer that describes loan modifications as available on the same day the Court is asked to find modification futile has not demonstrated futility. It has demonstrated that it continues to represent modification as available while declining to provide it — which is precisely the conduct the MMM Program and the RESPA enforcement mechanism are designed to address.

The complete SPS letter chronology is as follows:

On May 12, 2025, SPS certified to the CFPB: 'the account is currently ineligible for a loss mitigation resolution review' and 'Our review has confirmed no error(s) has occurred.'

On June 9 and June 12, 2025 — weeks after that certification — SPS mailed two letters stating: 'SPS is committed to home retention and offers many assistance options.'

On August 15, 2025, SPS confirmed in writing that what it had done in May 2025 was deny 'a modification application' — triggering the mandatory specific-reasons requirement of 12 C.F.R. § 1024.41(d), which SPS did not satisfy at any point.

On August 18, 2025, SPS listed as available: modification, 'a reduction of your interest rate, a partial payment deferral or an extension to the maturity date.'

On January 30, 2026 — four days after the Chapter 13 dismissal — SPS stated: 'There are options available to help resolve the default and avoid foreclosure.' On February 24, 2026, SPS announced a foreclosure sale.

Three days later, on February 27, 2026, SPS mailed a letter offering 'modifications or account settlement alternatives' — on the same account, in the same week. On May 27, 2026 — five days after the Chapter 11 filing — SPS mailed a letter stating: 'Our records indicate that your obligation has been discharged under the United States Bankruptcy Code.' The obligation had not been discharged and could not have been discharged at that stage. SPS mischaracterized the legal status of an active, pending bankruptcy in a written communication to the Debtors.

On May 28, 2026, SPS described as currently available: 'Modification — We may be able to provide you with a more affordable monthly payment by making changes to the terms of your mortgage loan. These changes may include a reduction of your interest rate, a partial payment deferral or an extension to the maturity date of your mortgage loan.' That same letter represented: 'SPS participates in the US Treasury Home Affordable Modification Program (HAMP).' HAMP was terminated by the federal government effective December 31, 2016. SPS represented participation in a nonexistent program to borrowers making loss-mitigation decisions in May 2026.

On June 11, 2026 — the day the objection was filed — SPS described loan modifications as available options on this account. SPS has never produced the specific governing provision it claims prohibits modification.

### D. Egregious Behavior.

The UST identifies two categories of allegedly egregious conduct: the missed Initial Debtor Interview, and what she characterizes as Debtors' complete disregard of the UST's requests for standard documentation. Neither characterization is accurate.

With respect to documentation requests: the standard documentation the UST references is typically transmitted with the Initial Debtor Interview notice — the same notice Debtors never received. Debtors have received no documentation request from the United States Trustee's office by any means since the filing of this case. The Initial Debtor Interview did not appear on the Court's online deadlines and hearings report for this case, and no accompanying document request arrived by first class mail or any other means. Debtors cannot produce documents they have not been asked to produce. The characterization of Debtors as having completely ignored documentation requests is not supported by the record. Debtors remain fully prepared to produce all standard Chapter 11 documentation at any time a request is transmitted to them at the contact information now on file.

With respect to the schedule omissions the UST identifies as additional examples of egregious conduct — the failure to attach the Schedule I Item 8a business income statement, the failure to disclose former name, the failure to disclose LLC ownership percentages on Schedule B Item 19, and the failure to disclose EINs on SOFA Item 27 — each of these is a known, disclosed deficiency in an acknowledged emergency skeleton filing that is the subject of the pending Schedules Motion, filed before the UST's objection. These omissions will be corrected in the amended schedules to be filed by June 26, 2026. They are not egregious conduct. They are the expected consequences of filing a skeleton petition pro se on the morning an attorney backed

out — four days before a foreclosure sale, with no time to prepare a complete filing and no counsel to guide them through the schedules — precisely the circumstance the Schedules Motion disclosed and Rule 1007(c) was designed to address.

The complete record of Debtors' response to the missed Initial Debtor Interview is set forth in Section VII below. That record demonstrates the opposite of egregious conduct.

## VI. ALLIANT CREDIT UNION'S OBJECTION IS UNTIMELY AND WITHOUT MERIT

Alliant Credit Union's objection is untimely. The Court's June 11, 2026 Order required all objections to be filed no later than June 15, 2026 at 5:00 p.m. Alliant filed its objection on June 16, 2026 at 11:55 a.m. — approximately nineteen hours after the court-ordered deadline — without any motion for leave to file late and without any explanation for the delay. Debtors respectfully submit that it should not be considered by the Court.

To the extent the Court considers Alliant's objection on its merits, it raises nothing not already addressed in the stay motion and this reply. Alliant concedes Debtors' documented monthly income of $21,083. It cites no case law. Its three-page memorandum offers no substantive factual analysis. Alliant argues that payments on the HELOC stopped in July 2025 without explanation. The explanation is that the entirety of Debtors' loss-mitigation efforts from June 2024 forward was focused on the first mortgage held by the COLT 2024-3 Trust and serviced by SPS — the dominant financial obligation on this estate at $12,439.21 per month on a $1,600,000 note at 8.000% fixed, and the threshold issue the reorganization was and is designed to resolve. Debtors did not separately negotiate with Alliant during the Chapter 13 because resolving the first mortgage dispute was the prerequisite to any comprehensive reorganization

plan that could address all obligations. Alliant's lien is fully preserved by the automatic stay and will be addressed in a plan of reorganization.

Alliant also misreads the stay motion. Debtors' explanation that Chapter 11 is not subject to the same structural constraints as Chapter 13 was a legal argument for why Chapter 11 is the correct and more effective reorganization vehicle for this case — not an admission of bad faith. The ability to propose a plan directly, pursue the MMM Program, and exercise cure and reinstatement rights under § 1124(2) are legitimate legal advantages that reflect sound judgment directly responsive to the specific failures of the prior case.

## VII.  THE INITIAL DEBTOR INTERVIEW

Debtors did not receive notice of the Initial Debtor Interview scheduled for June 11, 2026 at 10:00 a.m. by any means. No notice arrived by first class mail. The Initial Debtor Interview did not appear on the Court's online deadlines and hearings report for this case — the primary mechanism through which pro se filers monitor upcoming obligations in the absence of CM/ECF access.  Debtors had no means by which they could have known this interview was scheduled.

The UST's office subsequently confirmed that notice was sent by first class mail only.

Upon learning of the missed interview from the UST's June 11, 2026 objection — the same day it was filed — Elizabeth Ann Naylor contacted the UST's office immediately by email:

> *We did not receive notice of that interview and first learned of it from your filing.*
> *We would never knowingly miss a meeting with your office, and we are very sorry*
> *for any inconvenience the missed interview may have caused. We would genuinely*
> *appreciate the chance to make this right. Please let us know the next available*

*date and time for the Initial Debtor Interview, along with any documents you would like us to have ready, and we will appear and provide them.*

The UST's response stated in relevant part:

*I have confirmed that our paralegal mailed the notice to you at the address listed on your petition by first class mail. Therefore, you should have received it in your regular mail. If you want to be served with pleadings, please file updated contact information on the docket sheet. You will certainly obtain all notices much sooner if you have an email address on the record.*

The UST's own written response confirms that notice was sent by first class mail only and that no rescheduled date was offered. The response also confirms that the absence of an email address on the docket — not debtor negligence — was the reason electronic notice was not provided. As soon as this was communicated to them, Debtors filed their Notice of Contact Information on June 15, 2026, providing both email addresses and a telephone number. As of the date of this reply, the UST's office has not proposed a rescheduled IDI date despite Debtors' immediate outreach, sincere apology, and express offer to appear and produce all requested documents at any time. The UST's office has also not transmitted any document request to Debtors by any means since the filing of this case. Debtors remain fully prepared to complete the Initial Debtor Interview and produce all requested documents.

Not appearing at an interview of which no notice was received by any means is not egregious conduct. Contacting the UST's office the same day the missed interview was first discovered, apologizing without reservation, offering to appear and produce all requested

documents, filing contact information on the docket as directed, and continuing to remain available is the opposite of egregious conduct.

## VIII. CONCLUSION

The automatic stay should be extended for the duration of this Chapter 11 case. As the record detailed in Section V.B makes clear, the prior Chapter 13 was not dismissed because Debtors walked away from their obligations. It was dismissed because their attorney did not respond — not to the Trustee's thirty-day window, not to the Notice of Intent to Dismiss, and not to the repeated written requests for help that Elizabeth Ann Naylor sent on behalf of herself and her husband throughout the final months of that case, including her January 6, 2026 communication asking specifically about the hearing procedure the Trustee's own motion had identified as a path to preventing dismissal, and her final written plea four days before the case was lost. Debtors who spend months in written communication with their attorney identifying procedural options and asking him to act on them are not debtors filing in bad faith. They are debtors whose prior dismissal was not the product of their own conduct, and whose current filing reflects a genuine and documented determination to see this reorganization through.

The record of the current filing confirms that good faith. Amended schedules correcting every identified discrepancy will be filed by June 26, 2026. The tax returns have been filed. The reorganization purpose is the Mortgage Modification Mediation Program, where SPS will finally be required to engage under court supervision rather than decline without consequence; it is cure and reinstatement under 11 U.S.C. § 1124(2), a statutory right SPS cannot defeat upon plan confirmation; and it is a plan that addresses every creditor of this estate, not just the first lienholder. SPS described modification as available on this account in a letter received on the

very day the UST filed her objection and has never produced the governing provision it claims prohibits it. The creditor whose foreclosure sale is scheduled for July 28, 2026 appeared through counsel and chose not to object. Good faith is not merely asserted here — it is demonstrated by every action Debtors have taken since the moment the prior case was dismissed.

The UST's objection does not establish bad faith. It establishes that an emergency skeleton filing was incomplete — which Debtors disclosed to this Court before the objection was filed — and that SPS has declined modification through direct channels for two years, a position SPS has simultaneously contradicted in its own written letters. This Court is asked to decide whether Debtors who lost their prior case through no fault of their own, who identified the path to saving it and asked their attorney to take it, and who filed this case with a documented reorganization purpose and the income to support it deserve the opportunity to reorganize — or whether that opportunity should be foreclosed before the amended schedules are even filed, before the MMM motion can be brought, before § 1124(2) can be exercised, and before a single creditor has been paid.

At stake is the home of an eighty-year-old man with a stage four cancer diagnosis, Parkinson's disease of twenty-five years, and serious heart disease — a home configured specifically to accommodate his medical needs and to support the daily care he requires. Section 362(c)(3)(B) exists for precisely this moment. The good faith that section requires is present here, documented in the record, and demonstrated by the conduct of Debtors who had arranged for an attorney to prepare and file this petition on May 22, 2026, worked with him in anticipation of that filing, and learned the morning of that date — four days before a scheduled foreclosure sale — that he was unable to proceed, leaving them no choice but to file the skeleton petition themselves. Without counsel from that moment forward, they filed every available legal

document, served every available regulatory demand, sought a court-authorized extension of time to retain counsel and prepare accurate amended schedules, and engaged every available forum to preserve their home through legitimate legal process.

Respectfully submitted,

Dated: June 17, 2026

/s/  Ronald Stephen Owens
    RONALD STEPHEN OWENS
    *Debtor-in-Possession, Pro Se*
    11440 N 69th Street
    Scottsdale, AZ 85254

/s/  Elizabeth Ann Naylor
    ELIZABETH ANN NAYLOR
    *Debtor-in-Possession, Pro Se*
    11440 N 69th Street
    Scottsdale, AZ 85254

# <u>CERTIFICATE OF SERVICE</u>

This is to certify that on June 17, 2026, a copy of the foregoing was filed with the Court via the Court's Electronic Drop Box, served upon the following registered CM/ECF participants via the Court's electronic notification system, and additionally served via electronic mail as a courtesy copy:

Leonard J. McDonald, Esq.
Tiffany & Bosco, P.A.
Attorneys for Alliant Credit Union
1850 N. Central Avenue, 24th Floor
Phoenix, AZ 85004
Email: ljm@tblaw.com

Shellie LaBell
Robertson, Anschutz, Schneid, Crane & Partners, PLLC
13010 Morris Road, Suite 450
Alpharetta, GA 30004
Email: slabell@raslg.com

Jennifer A. Giaimo, Esq.
Office of the United States Trustee
230 N. First Avenue, Suite 204
Phoenix, AZ 85003
Email: Jennifer.A.Giaimo@usdoj.gov


*By:*

/s/ Ronald Stephen Owens
RONALD STEPHEN OWENS
*Debtor-in-Possession, Pro Se*
11440 N 69th Street
Scottsdale, AZ 85254

/s/ Elizabeth Ann Naylor
ELIZABETH ANN NAYLOR
*Debtor-in-Possession, Pro Se*
11440 N 69th Street
Scottsdale, AZ 85254